IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:14CR341 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | |
| KALI ALEXANDER, ET AL., | ) | GOVERNMENT'S OMNIBUS |
| | ) | RESPONSE IN OPPOSITION TO |
| Defendants. | ) | DEFENDANTS' PRETRIAL MOTIONS |

Now comes the United States of America, by and through its counsel, Steven M.

Dettelbach, United States Attorney, and Kelly L. Galvin and Paul M. Flannery, Assistant United

States Attorneys, and hereby responds to defendants' pretrial motions.

The defendants have filed a Motion for Disclosure of Confidential Informants (R. 34);

Motion in Limine to Exclude Out of Court Statements of Confidential Informants (R. 35);

Motion for Disclosure of Impeaching Information (R. 36); Motion for Discovery on the Issues of

Racial Profiling/Selective Enforcement and/or Selective Prosecution (R. 37) and Memorandum

in Support (R. 38); Motion to Dismiss the Indictment (R. 39); Motion to Sever Counts 8-11 of

the Indictment (R. 40); Motion in Limine to Exclude Other Acts/Crimes Evidence under F.R.E.

404(b) (R. 41); Motion to Preclude Sentencing Enhancement (R. 42); Motion for Early

Disclosure of Jencks Material (R. 43); Motion for Production of Brady Material (R. 44); and Motion for Severance Pursuant to Bruton v. United States (R. 45).  None of these motions have any merit.  For the reasons set forth in the Memorandum below, all of the defendants' motions should be denied.

## MEMORANDUM

### I.    BACKGROUND

In early August 2014, Special Agent (SA) Russell Johnson with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) was advised by an ATF Confidential Informant (CI), who is identified for purposes of this response as CI #1, that he met a person known to the CI as "Heem," later identified as Kali Alexander.  CI #1 was actually introduced to "Heem" by another ATF CI, who is identified for purposes of this response as CI #3.  CI #3 was previously incarcerated with Alexander in a state prison, and both were affiliated with the Heartless Felons prison/street gang.  CI #3 also knew Alexander by the nickname of "Heem."  During his first contact with Alexander in July 2014, CI #1 said Alexander wanted to sell him a firearm.  The CI did not purchase anything from Alexander, but obtained his cellular telephone number.

SA Johnson showed a photograph of Alexander to CI #1 who positively identified Alexander as the person he had met by the name of "Heem."  SA Johnson reviewed Alexander's criminal history and determined he had previously been convicted in 2009 for Aggravated Robbery with a Firearm Specification and Having a Weapon under a Disability.  Subsequent to Alexander's offer to sell firearms CI #1, and SA Johnson's positive identification and review of Alexander's criminal history, SA Johnson instructed CI #1 to inquire as to the type of illegal conduct in which Alexander was still involved.

On August 22, 2014, CI #1 informed SA Johnson that he had spoken to Alexander. CI #1 told Alexander about the CI's associate (actually undercover ATF SA Richard Zayas)

who, according to the CI, made narcotics deliveries.  The CI informed Alexander that the individuals for whom the associate made the deliveries were not paying the associate what he felt was a fair price.  CI #1 further informed Alexander that his associate was looking for somebody who could rob the individuals of the narcotics.  Alexander asked for more information, and CI #1 told Alexander he would have to meet the associate.

On August 24, 2014, CI #1 and another confidential informant, identified for purposes of this Response as CI #2, met with Alexander.  Alexander attempted to sell both CIs 10 grams of heroin for $90 a gram.  Alexander and the CI agreed to complete the sale on August 25, 2014.  They also discussed that Alexander could meet with CI #1's associate about a possible robbery.  Both CI #1 and CI #2 said they knew the individuals to be robbed, and therefore they were unable to participate in the possible robbery.

A.    AUGUST 25, 2014 MEETING

On August 25, 2014, CI #1 placed a recorded call to Alexander.[1]  They agreed to meet later that day.  During the call, Alexander told the CI he had just gotten out of court.[2]  At approximately 5:00 p.m., Alexander met with CI #1 and ATF SA Richard Zayas working in an undercover capacity.   The meeting took place in an ATF vehicle which was recording the event in both audio and video.[3]  Almost immediately, Alexander sold approximately 6.5 grams of heroin to CI #1 for $900.   Thereafter, SA Zayas explained to Alexander that he was a

---

[1] Throughout this response, the government will make reference to audio and/or video recorded transactions from the specific events as Electronic Surveillance (ES).  These recordings have been provided in discovery to all defendants.  This meeting is marked as ES #4.

[2] On August 25, 2014, Alexander appeared before a judge in Cuyahoga County Common Pleas Court and was sentenced to two years community control for Drug Possession, a felony of the 5th degree, in case number CR-14-585395-B.  The co-defendant on the case was Justin Maxwell, who is also a co-defendant in the instant case.

[3] This meeting is marked as ES #3.

disgruntled cocaine courier for a Mexican organization.  SA Zayas explained that generally he

picked up one kilogram of cocaine at a time from the organization and delivered it on their

behalf.  SA Zayas further explained that on the day of the collection he would be told where to

wait and the time he would receive a phone call.  When called, SA Zayas would be provided the

address of a house wherein the Mexican organization temporarily stored narcotics for

redistribution (hereinafter "stash house" or "drug stash house").  Upon arriving at the house, SA

Zayas would observe two individuals, one of which would be armed with a firearm.  The armed

individual would remain with SA Zayas, while the second individual would go to the living room

of the house and retrieve one kilogram from a stack of eight to nine marked kilograms.

SA Zayas said that he was due to be contacted on Wednesday, August 27, 2014, and on

that day, would be informed when the next collection would occur.  SA Zayas asked Alexander,

"How does that sound to you?"  Alexander promptly replied, "That sounds about right, man, that

sounds perfect, man."  SA Zayas explained to Alexander the cocaine was pure.  SA Zayas asked

Alexander, "You know what you're doing?"  Alexander replied, "I promise you, I know what

I'm doing, I'm about to holler at my big brother, then we going to orchestrate it from there, I

promise you, I don't do this but, like, I know, I live around this man, you do this like, I got you,

for sure, I got you, I promise you, I know what I'm doing, you ain't going to have to worry about

nothing."  SA Zayas responded that if Alexander did not know what he was doing they could

"stop talking."  Alexander stated, "I know bro, I got you, I'm telling you, you're good, I'm good,

we're going to get about that motherfucker right, I'm telling you, it's going to all go right."  SA

Zayas stated that they would meet on Wednesday (August 27, 2014).  SA Zayas advised

Alexander that the proceeds of the robbery, the eight to nine kilograms of cocaine, would be

divided evenly—half would be taken by SA Zayas, and the other half would be taken by

Alexander.  Alexander agreed to this arrangement. Alexander then left the area in his own vehicle.

After the meeting took place, Alexander called CI #1, who recorded the call, and stated he "appreciated" the meeting with SA Zayas.[4]  CI #1 asked Alexander if he had made contact with anyone else that might participate in the robbery.  Alexander stated he had made contact with others, and that "everything good, everything good."  CI #1 asked Alexander to make sure nothing happened to his associate (SA Zayas).  Alexander told CI #1 he would treat SA Zayas like "one of mines."  They agreed to stay in contact and to meet on Wednesday, August 27, 2014.

Prior to the August 27, 2014, meeting, SA Johnson reviewed a Cleveland Police Department (CPD) offense report for case number 2009-00285651.  On September 4, 2009, two individuals reported that they were robbed by several masked suspects, and an unmasked suspect with a sawed-off shotgun, who fled in a grey Cadillac.  Cleveland Police officers quickly saw the Cadillac and pulled it over.  Inside the Cadillac were Alexander, along with Rasheam Nichols, and Justin Maxwell (both charged in the instant offense), and two other suspects identified but not named herein.  Police found a .38 caliber revolver in Nichol's pocket, and a sawed-off shotgun at his feet.  There were two 9mm pistols and a BB gun in the car.  Police also found several masks in the car; a black face mask, a surgical mask, and a Halloween mask.  One of the victim's wallets was found in Maxwell's pocket.  Alexander was identified as the suspect who pointed the sawed-off shotgun at the victims.   Alexander, Nichols, and Maxwell were convicted of Aggravated Robbery with a Firearm Specification and Weapon Under Disability, and the other two individuals were convicted of Robbery.  A review of Alexander, Nichols, and

---

[4] This call is marked ES #5.

5

Maxwell's criminal history on the Ohio Law Enforcement Gateway showed all three individuals had been classified as members of Security Threat Groups while incarcerated; Alexander as a member of the Bloods, Nichols as a member of the Heartless Felons, and Maxwell as a member of 59th Hough.

      B.    <u>AUGUST 27, 2014 MEETING</u>

On August 27, 2014, CI #1 placed three separate telephone calls to Alexander.[5]  At 10:36 a.m., CI #1 called Alexander and asked if Alexander would be available to meet with SA Zayas and the CI later in the day.  Alexander answered that he would be available.  At 12:36 p.m., CI #1 called Alexander and asked if they could meet at 5:00 p.m.  Alexander said he got in contact with one other person who would also meet with them.  At 4:48 p.m., CI #1 called Alexander and confirmed they were ready to meet.

On August 27, 2014, CI #1 called Alexander in the presence of SA Zayas inside the ATF vehicle.  The call and the subsequent meeting inside the vehicle were audio and video recorded.[6]  Alexander confirmed he was bringing an associate with him to the meeting with CI #1, CI #2, and SA Zayas.  Subsequently, Alexander arrived with a male later positively identified as Rasheam Nichols, one of Alexander's co-defendants from the 2009 Aggravated Robbery conviction.  Alexander and Nichols arrived together in their own vehicle, and they entered the ATF vehicle.[7]  Alexander indicated he had already told Nichols about the robbery but wanted SA Zayas to "explain it some more dawg."  SA Zayas explained to Nichols that he was a disgruntled cocaine courier for a Mexican organization and that he generally picked up one kilogram of

---

[5] All three calls were recorded and are marked ES #12.

[6] This call and meeting are marked ES #6, #7, #8, and #9.

[7] Kali Alexander brought Rasheam Nichols to the meeting.  Nichols was not targeted by ATF, nor had any of the confidential informants had prior contact with him.

cocaine at a time from the organization and delivered it on their behalf.  SA Zayas said there was

supposed to be a collection the following Wednesday, on September 3, 2014.  SA Zayas said that

on Tuesday, September 2, 2014, he would receive information about the location, where he was

to wait, and the time at which he would be called.  SA Zayas stated that on the day of the

collection, he would be told the exact address of the stash house, and that the time period to

collect the cocaine is limited once SA Zayas is informed of the exact location of the stash house.

 SA Zayas explained that upon arriving at the stash house, he would observe two

individuals, one of whom would be armed with a firearm.  The armed individual would remain

with SA Zayas, while the second individual would go to the living room of the house and

retrieve one kilogram from a stack of eight to nine marked kilograms of cocaine.  Nichols asked,

"So there's only two people?"  SA Zayas replied, "Two people, yeah, that's what I see."  Nichols

asked SA Zayas, "Nobody else inside the house?"  SA Zayas responded, "That's all I see, you

know what I'm saying, I don't go to the back rooms and shit, but that's what I see."

 SA Zayas warned that the packaging on the kilograms would have to be removed after

the robbery because the cocaine was "pure coke" coming straight from Mexico.  SA Zayas stated

that the proceeds of the robbery—the kilograms of cocaine—should be divided half and half

between SA Zayas, on the one hand, and Alexander and his crew, on the other hand.  SA Zayas

asked Nichols, "Is that cool?"  Nichols replied "Cool."

 SA Zayas asked Alexander and Nichols how they intended to execute the robbery.

Alexander replied, "I want to go in, like, right after you go in, I want to get the best information

you can give, where we can be placed close, you feel me, so as soon as you tell me, so as soon as

you go in, we're right behind you, everything go down, you feel me, ain't nobody moves,

nothing, so that nobody be able to react to nothing."  Nichols said, "It's going to be the same

routine, so they ain't going to be expecting nothing."  SA Zayas told Alexander and Nichols, "they ain't going to hand it to you, I'm not going to lie to you either."  SA Zayas asked Nichols, "Do you know what you're doing?"  Nichols replied emphatically, "I know exactly what I'm doing."  SA Zayas asked Nichols, "We straight?"  Nichols responded, "Straight."  SA Zayas shook hands with Nichols and Alexander.  SA Zayas reiterated that they would meet on Tuesday, September 2, 2014.

As Alexander and Nichols were getting out of the vehicle, CI #2 asked Nichols where he had been previously incarcerated.  Nichols replied, "Erie, Toledo, Mansfield… I just got out of Mansfield."  CI #2 and Nichols discussed that they knew some of the same people because they had been incarcerated at the same institution.  Nichols said he went by the name "Sheam."

Based on Nichols' participation in the prior robbery with Alexander, his physical characteristics, and that he identified himself as "Sheam,"  SA Johnson showed SA Zayas, CI #1 and CI #2 an Ohio driver's license photo of Nichols after the meeting on August 27, 2014.  All three identified Nichols, the person in the photograph, as the individual they had just met with along with Alexander.

Prior to the meeting on September 2, 2014, SA Johnson reviewed a Cleveland Police Department (CPD) offense report for case number 2014-00130075.  On May 8, 2014, CPD officers were looking for two robbery suspects who were in a silver mini-van, with one of the suspects having dreadlocks.  Alexander had dreadlocks.  The officers observed Alexander and Maxwell standing near a mini-van which matched the description previously provided.  As the officers approached, Alexander and Maxwell fled the area but were eventually apprehended.  Officers recovered marijuana and crack cocaine on Alexander, and U.S. currency and credit cards belonging to another individual on Maxwell.   A .380 caliber handgun was found in

Alexander's flight path near a cellphone and keys Alexander stated belonged to him.  Alexander was ultimately charged with Possession of Criminal Tools and Drug Trafficking, and Maxwell was charged with Carrying a Concealed Weapon and Having a Weapon under a Disability.  Alexander was ultimately convicted of Possession of Drugs on August 25, 2014, and the case against Maxwell was dismissed.

      C.        SEPTEMBER 2, 2014 MEETING

      During the meeting on August 27, 2014, SA Zayas, Alexander, and Nichols agreed that they would meet again on Tuesday (September 2, 2014).[8]  On September 2, 2014, CI #2 placed several calls to Alexander for the purpose of meeting later in the day.  During one of the calls, SA Zayas asked Alexander to meet that afternoon.[9]  At approximately 4:30 p.m., SA Zayas and CI #2 met with Alexander and a male, later identified as Justin Maxwell, one of Alexander's co-defendants from the 2009 Aggravated Robbery conviction, for the purpose of discussing the robbery.[10]  Alexander and Maxwell arrived together in their own vehicle.  The meeting inside the ATF vehicle was audio and video recorded.[11]  SA Zayas asked Alexander if he (SA Zayas) had previously met Maxwell.  Alexander replied, "No, this is my other brother, he's coming with me too."  SA Zayas advised that he was supposed to be contacted the following day (September 3, 2014) at 6:00 p.m. and was told to wait near the intersection of Detroit Road and West

---

[8] Prior to this meeting occurring, CI #1 and CI #2 saw Alexander and Nichols at Tower City Mall in downtown Cleveland on August 28, 2014.  This meeting was not planned or recorded.  Alexander informed the CIs that he was waiting for his brother to pick him up.  A short time later, Nichols arrived and picked up Alexander.

[9] A total of four telephone calls were made to Alexander's phone from 11:16 a.m. to 11:25 a.m.  All telephone calls, with the exception of one call, are recorded and marked as ES #11 and 12.

[10] Kali Alexander brought Justin Maxwell to the meeting.  Maxwell was not targeted by ATF, nor had any of the confidential informants had prior contact with him.

[11] The meeting is marked ES 13, 14, 15, and 16.

Boulevard.  SA Zayas asked Alexander and Maxwell if they needed a vehicle for the robbery.

Alexander responded, "Yeah, I'm going to need one."  SA Zayas advised that they could use his

girlfriend's vehicle.  Alexander replied, "It's a go, we ready man."  SA Zayas arranged for CI #2

to meet with Alexander and Maxwell at 5:00 p.m. the following day.

SA Zayas then asked Alexander, "You told him about the keys and everything?"

Alexander replied, "Everything."  Maxwell responded, "He already told me about everything."

SA Zayas then stated, "There's going to be like eight, nine keys of coke in there… we're going

to split it in half… but there's those two armed Mexicans, you know what I'm saying, so we can

talk about the plan and shit tomorrow, you tell me exactly what you want me to do."  Alexander

asked, "Okay so, so, what time are we gon'meet up tomorrow though? Like, we got to meet at

least like an hour or two before then."  SA Zayas replied they could meet at 5:00 p.m.  Alexander

advised that he would be ready to execute the robbery the following day (September 3, 2014).

Alexander stated that he had five (5) more grams of "brown" (heroin) for sale, which SA Zayas

did not purchase.

Based on Maxwell's participation in the prior robbery with Alexander and Nichols, SA

Johnson showed SA Zayas and CI #2 an Ohio driver's license photo of Maxwell after the

meeting on September 2, 2014.  Both identified the person in the photograph, Justin Maxwell, as

the individual with whom they had just met along with Alexander.

D.     SEPTEMBER 3, 2014 MEETING AND ARREST

On September 3, 2014, CI #2 drove in an ATF undercover vehicle to 1905 East 55th

Street, Cleveland, Ohio, for the purpose of meeting Alexander, Nichols, and Maxwell and

driving them to meet with SA Zayas to discuss the final details of the robbery plan.  When CI #2

arrived, Alexander, Nichols, and Maxwell were present, along with two other individuals later

identified as Terrance Chappell and Kenneth Flowers.[12]  All five individuals entered CI #2's vehicle, with Alexander in the front passenger seat, and in the back seat, from rear passenger side to rear driver side was Chappell, Flowers, Nichols, and Maxwell.  At approximately 5:05 p.m., CI #2 drove the five individuals to meet SA Zayas as previously agreed upon on September 2, 2014.  Audio and video equipment inside the vehicle recorded the conversations and was monitored in real time.[13]

During the approximately 30 minute car ride to SA Zayas' location, there was general conversation about the robbery, and that eight to nine kilograms of cocaine were expected to be taken.  Immediately after he entered the CI's vehicle, Alexander spoke about how he "orchestrated it," and that he "needed this bitch [the robbery]."  Alexander also stated that the robbery was going to put him back on his feet financially.   Nichols asked how many people would be inside the house.  Maxwell asked how many firearms the persons inside the house would have.  Flowers asked if everything (kilograms of cocaine) would be out or if they would have to look for it.  Flowers and Nichols were each observed in the video holding firearms.  It was clear from the discussion that the purpose of the defendants being together was to commit an armed robbery of kilograms of cocaine.  None of the defendants expressed hesitation to each other, nor indicated they would not participate in the robbery.

At approximately 5:28 p.m., CI #2 and the five individuals arrived at SA Zayas' location, a drugstore on Madison Avenue in Cleveland, Ohio.  At approximately 5:29 p.m., SA Zayas entered CI #2's vehicle and observed that Alexander was sitting in the front passenger seat.  SA

---

[12] Kali Alexander brought Terrance Chappell and Kenneth Flowers to the meeting.  Chappell and Flowers were not targeted by ATF, nor had any of the confidential informants had prior contact with either of them.

[13] This recording is marked ES # 18.

Zayas further observed that Maxwell, Nichols, Flowers and Chappell were sitting in the rear passenger seat.  SA Zayas greeted all the individuals and questioned them, "How we going to do it?"  Nichols stated, "Shut the door."  SA Zayas complied and entered the vehicle, sitting in the driver's seat, and closed the door to the vehicle.

SA Zayas advised that when called, on this date, he would be provided the address to the house and he (SA Zayas), in turn, would provide the address to Alexander and the robbery crew. SA Zayas explained that upon arriving at the stash house, he would knock on the door.  Two "Mexicans" guarding the house would be present, one of which would be armed with a firearm. After being allowed into the house, SA Zayas would close the door to the house, and the second individual would go to the living room where eight to nine marked kilograms of cocaine would be kept.  SA Zayas would be provided one of the kilograms for transportation and then he would promptly depart.

SA Zayas asked how the defendants intended to execute the robbery.  Maxwell asked, "You want us to come after you leave out?"  SA Zayas stated it was up to them but he didn't want to "get shot in the head."  Nichols answered, "you ain't going to get shot, bro."  Flowers asked SA Zayas if the house had stairs or a porch.  SA Zayas responded that the houses were small, regular homes.  Nichols asked SA Zayas, "They got people watching the house?"  SA Zayas replied, "No, all I ever see is those two guys."  Flowers advised that they could enter the house behind SA Zayas on the "second knock."  Nichols asked if SA Zayas would "leave the door open?"  Alexander said, "Well don't lock it and we're coming in right behind you." Nichols asked SA Zayas, "What kind of gun do he (Mexican) got?"  SA Zayas replied, "A pistol in his pants."  Flowers then asked about the second Mexican.  SA Zayas responded that he was not sure.  Nichols questioned, "Do you think anybody else be in the house?"  SA Zayas

12

answered, "All I ever see is those two dudes, but I don't want to lie to you, fuck, there could be a guy in the back, but I never see anybody, all I ever see is those two."  Alexander said they needed to clear the house prior to looking for the cocaine.  SA Zayas questioned all the individuals if they were in possession of firearms.  No one answered with a negative response.

SA Zayas advised Alexander, Nichols, Maxwell, Chappell, and Flowers that the proceeds of the robbery—kilograms of cocaine—would be divided half and half between SA Zayas and the robbery crew.  Nichols asked SA Zayas if there would be money in the house.  SA Zayas replied that he "never sees any money."  SA Zayas stated there would be eight to nine "keys of coke."  SA Zayas advised it was "pure cocaine" from Mexico.  Nichols questioned SA Zayas, "What if we just go in there and shoot them?"  SA Zayas responded that he did not care for the individuals in the house.  SA Zayas advised all the individuals, "They ain't just going to hand it to you."  Nichols replied, "We're just going to shoot them."  Alexander stated that SA Zayas needed to drop as they entered the house.  SA Zayas asked all five individuals, "Is that cool, so we straight, is that cool, we split everything, cool?"  No one answered with a negative response.  Chappell asked SA Zayas about the vehicle they would use during the robbery.   SA Zayas advised that his girlfriend's vehicle was in close proximity and requested that they follow him to this location.  Although some defendants were more engaged in the planning than others, all of the defendants asked SA Zayas at least one question or provided an opinion regarding how the robbery should occur.  Once all defendants indicated their knowledge of, and willingness to participate in the robbery, SA Zayas left the vehicle and CI #2 got back in the driver's seat of the Cadillac.

CI #2 and the defendants, in the undercover vehicle, followed SA Zayas, in his vehicle, to the pre-arranged arrest location.  During the 5-minute ride, Alexander told the other defendants,

"Any one of y'all now don't want to go, give me that hammer (firearm) right now." None of the defendants expressed reservation or gave their gun to Alexander. None of the defendants indicated they wouldn't participate in the robbery. Alexander also stated that they should've gone in the drugstore and "got some gloves."

SA Zayas drove to a commercial structure on Madison Avenue, Cleveland, Ohio, followed by the vehicle containing CI #2, Alexander, Nichols, Maxwell, Chappell and Flowers. Upon arriving, all the individuals exited their vehicle. SA Zayas pointed out his "girlfriend's" vehicle that he previously said they could use during the robbery. SA Zayas then provided a prearranged arrest signal. As the arrest team exited the structure, Alexander, Nichols, Maxwell, Chappell, and Flowers fled and were ultimately arrested on the property, with the exception of Chappell.[14] Chappell was arrested following a short foot chase onto the adjacent property.

A total of five firearms were recovered from the scene: a Ruger, Model P95, 9mm pistol, serial number 317-07207, a Cobra Enterprises, Mode FS380, .380 caliber pistol, serial number FS086835, a Hi-Point, Model C, 9mm pistol, serial number P038763, a Smith & Wesson, Model Victory, .38 caliber revolver, serial number V482232, and a Hi-Point, Model C9, 9mm pistol, serial number P199441. The Ruger, the Cobra, and the Smith & Wesson were manufactured outside the state of Ohio. All of the firearms were loaded and contained ammunition which was manufactured outside the state of Ohio.

E.     DEFENDANTS' STATEMENTS

Once all five defendants were in custody, they were placed in police vehicles which recorded their conversations. As the defendants were placed inside, they were told these were

---

[14] This event was audio and video recorded and is marked ES #27.

police vehicles. Flowers and Nichols were placed inside one vehicle together.[15]  Alexander, Maxwell, and Chappell were placed inside a separate vehicle together.[16]  Flowers and Nichols discussed that they were talking to the police the whole time.  Alexander, Maxwell, and Chappell discussed the possibility that the events had been recorded.    They also discussed what crimes they thought they could be charged with committing.  They acknowledged they could all be charged with having firearms.  Chappell and Maxwell discussed how they thought the robbery was "fishy."

Alexander was Mirandized, waived his right to counsel, and agreed to give a post-arrest statement.[17]  Alexander admitted to a plan to rob a stash house guarded by two Mexicans, one of whom would be armed.  Alexander admitted knowledge there was supposed to be eight to nine "bricks," which he further described as cocaine.  Alexander said he discussed "hitting the lick (robbery) and taking the bricks (kilograms of cocaine) from the Cuban (SA Zayas).  Alexander said even though the initial plan was to split the cocaine, he and the other suspects would have kept all the cocaine.  Alexander said the decision to keep all the cocaine was his.  Alexander said, "I got respect in the hood and I put it all together."  Alexander admitted they discussed the possibility that someone guarding the cocaine might be shot or even killed. "If somebody try to shoot us…. Shoot back ya feel."  Alexander admitted that the defendants had at least four firearms—three "autos" and one revolver.  He denied he was in possession of a firearm, however.  Alexander said he sent his "brothers" to get the guns from his connection, "John."

---

[15] The event was audio recorded and is marked ES #22.

[16] This event was audio recorded and is marked ES #21.

[17] This event was audio and video recorded and is marked E #21.

Nichols was Mirandized and waived his right to counsel initially.[18] Nichols admitted he knew the other defendants and that Flowers was his cousin. Nichols stated he had no purpose in getting into the car with the other defendants. Nichols falsely stated he had never seen the Hispanic (SA Zayas), or the driver of the Cadillac (CI #2), before the day of his arrest. Nichols said there was no specific conversation in the car during the ride from the east side to the west side of Cleveland. Nichols further falsely claimed that the Hispanic talked to the driver of the Cadillac but he didn't hear the conversation. When confronted with information that the entire conversation in the vehicle that day, as well as other meetings throughout the investigation, had been recorded and informed he was lying, Nichols indicated he no longer wished to answer questions.

Maxwell was Mirandized, waived his right to counsel, and agreed to give a post-arrest statement.[19] Maxwell stated that Alexander, who he knew as "Heem," had approached him about a week before the robbery was to occur, wanting to know if Maxwell would participate. Maxwell said he was "thirsty" (in need of money) so he agreed and met with Alexander and SA Zayas. Maxwell understood the plan to be a robbery of a stash house for eight to nine kilograms of cocaine. Maxwell said he along with Alexander, Nichols, Chappell, and Flowers all met around 11:00 a.m. the day the robbery was to occur. Maxwell described the others as "thirsty" as well. Maxwell said the plan was to go inside the house and steal the "bricks." Maxwell said that Chappell talked about tying up people inside the house. Maxwell admitted to possession of the Smith & Wesson revolver, which was recovered in close proximity to where he was arrested,. He further admitted the gun was loaded. Maxwell stated Flowers handed him the Smith &

---

[18] This event was audio and video recorded and is marked E #22.

[19] This event was audio and video recorded and is marked E #31.

Wesson revolver in the car. Maxwell stated he saw the other defendants with firearms and he described the firearms.  Maxwell said Alexander would be the person to sell the cocaine. He described Alexander as having a reputation of selling drugs, and doing "dope licks" (robbery for drugs or drug dealer) and "stick-ups" (robbery).  Maxwell admitted he had been arrested with Alexander on two prior occasions, one which involved a robbery and another involved drugs and a firearm.  Maxwell said a sixth individual was supposed to conduct the robbery with the rest of them but he backed out.

Chappell was Mirandized, waived his right to counsel, and agreed to give a post-arrest statement.[20]  Chappell said he got into the car with the other defendants because he wanted to get something to eat.  Chappell said he had a firearm on him at the time, a Ruger 9mm pistol. Chappell said he acquired the firearm approximately a month and a half ago from someone on the street.   He said he carried it for protection.  Chappell further stated "Heem" told him that they had something important to do first, but then they would take him to get something to eat. During the car ride from the east to the west side of Cleveland, Chappell said the others in the car talked about making money.  Chappell admitted he overheard the plan to rob the Mexicans of eight to nine kilograms of cocaine when the "Puerto Rican or Mexican" guy (SA Zayas) got into the car.  However, Chappell insisted that he was going to stay in the car during the robbery, and that he was quiet during the discussion of how to commit the robbery.

Flowers was Mirandized, waived his right to counsel, and agreed to give a post-arrest statement.[21]   Flowers stated that Alexander was the individual to whom he first spoke about conducting a robbery of "bricks."  Flowers said he saw Alexander at approximately 2:00 p.m. on

---

[20] This event was audio and video recorded and is marked E #20.

[21] This event was audio and video recorded and is marked E #29.

the day the robbery was to occur.  Flowers initially thought the robbery was for marijuana; however, he later learned the robbery was for cocaine.  Flowers understood there would be two people in the house.  Flowers said he knew "Heem" and Nichols because Nichols was his cousin.  Flowers admitted he was in possession of a loaded Cobra .380 pistol.  Flowers said the plan was just to have the people in the house lay down.  When asked if there was any discussion about shooting anyone Flowers responded, "If we had to, why not?"

      F.    <u>DEFENDANTS' CRIMINAL HISTORIES</u>

Four of the defendants have a prior criminal record.  Alexander has criminal convictions for aggravated robbery with a firearm specification and weapon under disability, carrying a concealed weapon, drug possession, and has additional arrests for failure to comply, theft, and obstructing justice.  Nichols has criminal convictions for aggravated robbery with a firearm specification and weapon under disability, and possession of drugs.  Maxwell has criminal convictions for aggravated robbery with a firearm specification and weapon under disability, and drug abuse.  Chappell has criminal convictions for burglary and drug abuse.  Flowers does not have any convictions.

All five defendants were subsequently indicted for conspiracy to possess five or more kilograms of cocaine, and using a firearm in relation to a drug trafficking crime.  Four defendants, excluding Flowers, were indicted for being a felon in possession of a firearm or ammunition.

## II.    <u>LAW AND ARGUMENT</u>

Kali Alexander is central to the inception of this case.  Alexander was previously convicted of armed robbery and possessing a weapon while under disability (along with co-defendants Nichols and Maxwell).  He has also used and sold drugs, possessed firearms, and demonstrated a propensity to commit armed robbery.  He became known to the ATF through an

informant who stated Alexander tried to sell him a firearm.  When told of an opportunity to commit a robbery of a drug stash house, Alexander promptly agreed and quickly recruited four other individuals, three of whom were also convicted violent felons, to conspire to participate. All five defendants were informed of how dangerous the robbery would be, and none expressed any hesitation to commit the offense.  Indeed, several defendants expressed a willingness to shoot or kill anyone who got in their way.  Alexander demonstrated the ability to sell narcotics. All five defendants demonstrated the ability to obtain firearms.

Defendants' argue, among other things, that they were profiled and selected for prosecution based upon their race, that they were entrapped by the government to commit a fictitious crime that they otherwise would not have committed but for the government's inducement, and that the government's conduct in inducing them to commit the crime is so outrageous as to warrant a dismissal of the indictment.  These arguments are entirely devoid of merit.  None of the defendants were selected as targets because of their race, but rather for their documented propensity to commit violent crime.  Their propensity to commit these serious crimes is evidenced not only by their criminal histories, but by their actions in the instant offense.  Secondly, only Alexander was an initial target of the ATF, the other defendants were recruited by Alexander and brought to the government, not the other way around.  Lastly, all the government did was provide the opportunity to the defendants to commit a crime several of them had already committed together—that is, armed robbery.

Contrary to the defendants' misguided assertions throughout their pretrial motions, a "home invasion" robbery is not a fictitious crime, nor was the crime invented by law enforcement.   Home invasion robberies involve entry into a residence by force, and often times involve the use of firearms.  Those inside are ill-prepared to protect themselves or prevent the

ensuing robbery.  There is a much less likelihood for the presence of police, security, or cameras to deter or prevent the conduct, such as in retail or commercial robberies, or bank robberies. Home invasion robberies are well documented in Northeast Ohio, and many have proved to be extremely violent or even fatal.[22]  A home invasion is also ideal in those instances where a "victim" is much less likely to report a robbery because the items taken were narcotics or proceeds of narcotic trafficking. [23]

A.     SELECTIVE PROSECUTION AND DISCOVERY REQUEST

In United States v. Armstrong, 517 U.S. 456 (1996), the Supreme Court held that in order to obtain discovery on a selective prosecution claim, a defendant must prove by "some evidence" that the "federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose."  Id. at 465 (citations omitted).  For more than a century, the Supreme Court has required that discriminatory effect be shown through evidence that similarly situated individuals of a different race were not prosecuted.  Id.  Although the similarly situated requirement is strict, the Supreme Court noted that it "does not make a selective prosecution claim impossible to prove," or create "an insuperable task" for defendants.  Id. at 466, 470. Indeed, the Supreme Court found that a rigorous standard "adequately balances the government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution."

---

[22] www.Cleveland.com, 12/16/13 "Man sentenced to 25 years in prison for home invasion that scarred elderly couple and entire neighborhood"; www.Cleveland.com, 12/10/14 "Lookout in Akron home invasion murder sentenced to 8 years"; www.Cleveland.com, 10/29/14 "Man tied up, $20,000 coin collection stolen in Cleveland home invasion"; www.Cleveland.com, 2/17/15 "Girl faces life sentence after guilty plea in fatal home invasion"; www.Cleveland.com, 12/13/13 "Home invasion ends with 2 young children dead in fire on Cleveland's East side"; www.Cleveland.com, 12/9/14 "Three gunmen force Akron residents into attic, steal gun and cash during home invasion"

[23] www.Cleveland.com, 12/27/14 "One dead, one injured in Massillon drug-related home invasion shooting"; www.Cleveland.com, 11/6/14 "Cleveland police find remnants of marijuana operation after home invasion";

Id. at 470.  In Armstrong, the defendant's "evidence" of discriminatory effect and purpose, an affidavit by a paralegal and a study of drug trafficking crimes prosecuted by race and type of drug (cocaine or crack cocaine), wholly failed to make the requisite showing.

The Court also expressed reservation to oversee prosecutorial discretion.

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.  Judicial supervision in this area, moreover, entails systemic costs of particular concern.  Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the government's enforcement policy.  All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

Id. at 455 (citing Wayte v. United States, 470 U.S. 598, 608 (1985)).

Because prosecutorial decision-making enjoys a presumption of regularity, a defendant who seeks to rebut the presumption by claiming selective prosecution faces a "demanding" standard and must present "clear evidence" that the government has violated equal protection. Id. at 464.  A selective prosecution claim is not a defense to the criminal conduct, but instead is an assertion of misconduct.  Therefore, discovery is not available under Fed. R. Crim. P. 16 until defendant has demonstrated clear evidence to the contrary.  Id. at 463.

In United States v. Bass, 536 U.S. 862 (2002) (per curiam), the Supreme Court reaffirmed its aversion toward examination of prosecutorial discretion.  Bass, who was African American, was charged with the intentional killing of two individuals.  The United States filed a notice of intent to seek the death penalty.  Bass alleged the decision was racially motivated and moved to dismiss the notice, or in the alternative seek discovery of information related to capital

charging practices.  The district court granted the discovery request.  The government informed

the court it would not comply with the order, and the court dismissed the death penalty notice.

The Sixth Circuit upheld the district court and the government appealed.[24]  The Supreme Court

summarily reversed the Sixth Circuit, citing that a defendant must make a "credible showing"

that "similarly situated individuals of a different race were not prosecuted."  Armstrong at 465.

"Even assuming that the Armstrong requirement can be satisfied by a nationwide showing, raw

statistics regarding overall charges say nothing about charges brought against similarly situated

defendants… because respondent failed to submit relevant evidence that similarly situated

persons were treated differently, he was not entitled to discovery."  Bass at 863-64.  See also

Keene v. Mitchell, 525 F.3d 461, 464 (6th Cir. 2008) (holding that statistics indicating a disparity

between the percentage of African Americans in the general population and the percentage

charged with capital murder, standing alone, failed to demonstrate that race played a part in the

defendant's prosecution and sentencing).

        In the instant case, defendants "seek information regarding the policies and practices of

the ATF in conducting these type [of] stings for the purpose of supporting a motion to dismiss

and/or defense that ATF has engaged in racial profiling and selective prosecution in the present

situation.  Specifically, defendants believe that the ATF has potentially engaged in targeting

people of color, as these defendants are, in a specific kind of crime that they create, i.e. phony

---

[24] United States v. Bass, 266 F.3d 532 (6th Cir. 2001), held that defendant presented sufficient
evidence of discriminatory effect and purpose through a Department of Justice Survey on the
death penalty protocol containing percentages of white versus blacks charged with death eligible
crimes, plea bargaining percentages based on race, and public comments of the Attorney General
and Deputy Attorney General which expressed concern over the significant racial disparities.
The Court determined "Bass's evidence shows the same type of statistical disparity the Supreme
Court previously approved of in Armstrong as 'indisputable evidence' of a law's discriminatory
effect." Bass, 266 F.3d at 538.

stash house ripoff cases."  (Def. Motion for Discovery, R. 37; PageID 312).  Defendants acknowledge at least one similar case prosecuted in the Northern District of Ohio.  They further cite statistics from the Northern District of Illinois which represent a "disturbing statistical pattern" of how many defendants of specific ethnicities were prosecuted for the same crime.  They offer no rationale for how these statistics support their request for discovery in this district, nor do they offer statistics from any other districts, or more importantly, this district.  Nevertheless, defendants erroneously conclude that those statistics "present[s] a stark discriminatory picture because in these kinds of cases, the ATF and the U.S. Attorney's Office are not pursuing the prosecution of persons for actual crimes an ATF investigation has uncovered.  Instead, informants and the ATF are selecting persons to present with the opportunity to commit what the targets are told will be a lucrative crime."  (Id. at PageID 314.)

Defendants request discovery from the U.S. Attorney's Offices in both the Northern and Southern District of Ohio, any authorizations by any federal agency, the Justice Department or the White House, all national and field office ATF manuals or correspondence which discusses or authorizes "phony stash house ripoffs," or documentation by ATF or U.S. Attorney's Offices which explains procedures to avoid targeting suspects on the basis of race.  (Id. at PageID 316.)

Defendants filed a second motion for discovery based upon selective prosecution (Def. Motion for Discovery, R. 38; PageID 320).  In this motion, defendants cite United States v. Davis, 766 F.3d 722 (7th Cir. 2014), as authority for this Court to grant their discovery request.  However, that is not what Davis opined.  In Davis, the district court found that defendants had put forth a sufficient showing to warrant a pretrial discovery request.  The government indicated it would not comply with the discovery order and suggested the court dismiss the indictment without prejudice so it could appeal the court's decision.  The district court obliged and the

government appealed the discovery order.  However, the primary issue on appeal was whether the appellate court had jurisdiction to hear the case.  Ultimately, the Court concluded that the dismissal of the indictment without prejudice was not a final appealable order.  Id. at 734.  Davis did not hold, as the defendants suggest in their instant motion, that the defendants had made a "credible showing" of discriminatory effect and intent.  (R. 38; PageID 322).

While there are several cases in pretrial and post-conviction litigation, no home invasion style robbery case has been overturned by the 7th Circuit on grounds of selective prosecution. The prevailing law in the 7th Circuit continues to require the rigorous standard adopted in Armstrong.  Unlike Davis, the issue in United States v. Barlow, 310 F.3d 1007 (7th Cir. 2002), was the district court's determination that the defendant had not met his burden to establish a racial profiling claim.[25]  Barlow, who was found in possession of 485 grams of crack cocaine and a firearm, alleged he was "pursued, stopped, interviewed, and investigated by Drug Enforcement Administration Agents based on his race."  Id. at 1009.  Barlow's "credible evidence" consisted of an affidavit written by a psychologist/statistician who counted the race and number of individuals under surveillance of law enforcement, and who law enforcement selected to approach for further investigation during a 10-day period of time.

Barlow contended that the DEA agents had enforced the law selectively by choosing to approach, interview, and search African Americans but not Caucasians, i.e., by engaging in racial profiling. To obtain discovery on this claim, Barlow was required to present evidence that

---

[25] Barlow complained not of selective prosecution, but of racial profiling, a selective law enforcement tactic. But the same analysis governs both types of claims: a defendant seeking discovery on a selective enforcement claim must meet the same "ordinary equal protection standards" that Armstrong outlines for selective prosecution claims. See Armstrong, 517 U.S. at 465; Chavez v. Ill. State Police, 251 F.3d 612, 635-36 (7th Cir. 2001); United States v. Hayes, 236 F.3d 891, 895 (7th Cir. 2001) Hayes, 236 F.3d at 1010.

DEA agents chose not to approach whites to whom he was *similarly situated* (emphasis added). Armstrong, 517 U.S. at 468-69; Chavez, 251 F.3d at 638; Hayes, 236 F.3d at 895. A finding that DEA agents did not approach whites who rode the Southwest Chief [train] as frequently as African American travelers would not automatically establish that the agents' investigatory tactics were discriminatory; Barlow needed to show also that at least some of these whites not approached were similarly situated to him. Armstrong, 517 U.S. at 468-69; Chavez, 251 F.3d at 638; Hayes, 236 F.3d at 895.  Like many other failed claims, Barlow presented no evidence that he received less favorable treatment than similarly situated white travelers.  Barlow, 310 F.3d at 1012.  Similarly, Barlow presented no evidence of discriminatory purpose.  Id.  Therefore, his claim failed.

The Sixth Circuit analyzed a selective prosecution claim in United States v. Thorpe, 471 F.3d 652 (6th Cir. 2006).  Thorpe was arrested by the Detroit Police Department in March of 2003 for possessing a firearm.  His case was subsequently adopted for prosecution by the U.S. Attorney's Office in accordance with the Project Safe Neighborhood (PSN) program, a gun crime reduction initiative of the Attorney General.  Thorpe was indicted for being a felon in possession of a firearm.  Thorpe filed a motion to dismiss the indictment, alleging the PSN program resulted in selective prosecution on the basis of race.  Thorpe submitted statistical reports from the U.S. Sentencing Commission on the rates of prosecution and imprisonment among persons convicted of firearms, the racial composition of Michigan counties, and reports maintained by the Federal Public Defender's Office documenting the race of defendants in pending firearm cases.  Thorpe conceded his records were insufficient to warrant a selective prosecution claim, but thereafter requested the district court make an *in camera* inspection of PSN records, which was granted.  The U.S. Attorney's Office reluctantly agreed to produce some

25

of the records but ultimately the district court dismissed the indictment for the government's failure to comply with the discovery order.

The Sixth Circuit determined that Thorpe's statistics were insufficient to establish some "credible evidence." Even assuming Thorpe had met his burden, he failed to produce any evidence of discriminatory intent. Like the defendants in the instant case, Thorpe then alleged that the government knowingly pursued an initiative despite knowledge of discriminatory effect, which effectively is evidence of discriminatory intent. Id. at 661.[26] Although not finding that outcome impossible, the Court noted that "such a finding remains the exceedingly rare exception to the general rule." Cf. Wayte v. United States, 470 U.S. 598, 610 (1985).

Defendants baldly assert that they have provided "hard and significant evidence of the stark racial disparity in the creation and prosecution of made-up crimes – phone stash house ripoffs by the ATF." (Def. Motion for Discovery, R. 38; PageID 323). To the contrary, defendants have not provided any relevant statistics demonstrating **any** showing, let alone a "credible showing," that the ATF or U.S. Attorney's Office has engaged in the practice of selective prosecution. Defendants have merely regurgitated information in another district, but have drawn no correlation between those statistics and this district, other than to say the same federal agency investigated the cases. They have put forth no evidence of a discriminatory effect or intent, nor have they attempted to argue that "similarly situated individuals of a different race were not prosecuted."

---

[26] (Def. Motion for Discovery, R. 38; PageID 324) ("The second Armstrong prong is a showing of discriminatory intent. Again, the fact that since 2009 zero white defendants have been charged in these cases [in the Northern District of Illinois] is one way to show intent (citations omitted). Another way to show discriminatory intent has been to show that the entity engaging in the discrimination is merely burying its head in the sand to avoid the obvious.")

Defendants allege that "the potential pool of similarly situated whites is reasonably the entire adult white population." (Def. Motion for Discovery, R. 38; PageID 324). This argument based upon general assumptions demonstrates the inherent flaw in defendants' position, and was rejected in the Armstrong court.[27] The potential group of persons willing to engage in a very dangerous armed robbery of a drug stash house cannot be defined by an entire ethnic or racial population. It is not all Caucasians, just as it is not all African Americans or Hispanics. The category of persons who are predisposed to commit a crime of this nature is likely a very small percentage of any particular population. The person who is predisposed to commit a home invasion has likely robbed an individual before, is willing to inflict physical harm upon another, has possessed, handled, and has access to firearms, demonstrates a willingness to brandish and threaten with a firearm, is incentivized by monetary gain, and has some means to dispose of illegal narcotics. Under the defendants' theory, even a simple drug user or petty shop lifter would be a similarly situated defendant so long as he was Caucasian. However, under Armstrong, the similarly situated comparison group would have to constitute Caucasians who exuded the same violent criminal characteristics of these defendants.

In deciding whether other persons are similarly situated, courts recognize that the government can consider a wide range of factors, such as the "strength of the case, the

---

[27] The Armstrong Court was critical of the assumptions relied upon by the appellate court. "The Court of Appeals reached its decision in part because it started "with the presumption that people of all races commit all types of crimes—not with the premise that any type of crime is the exclusive province of any particular racial or ethnic group." United States v. Armstrong, 48 F.3d 1508, 1516-17 (9th Cir. 1995). It cited no authority for this proposition, which seems contradicted by the most recent statistics of the United States Sentencing Commission. Those statistics show: More than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black, United States Sentencing Comm'n, 1994 Annual Report 107 (Table 45); 93.4% of convicted LSD dealers were white, ibid.; and 91% of those convicted for pornography or prostitution were white, id., at 41 (Table 13). Presumptions at war with presumably reliable statistics have no proper place in the analysis of this issue." Armstrong at 469-70.

prosecution's general deterrence value, the government's enforcement priorities, and the case's relationship to the government's overall enforcement plan."  Wayte, 470 U.S. at 608.  Other factors courts may consider are culpability, flagrancy of the violation, and criminal history.  See United States v. Darif, 446 F.3d 701 (7th Cir. 2006) (culpability); United States v. Cyprian, 23 F.3d 1189 (7th Cir. 1994) (flagrancy); and United States v. Jordan, 635 F.3d 1181 (11th Cir. 2011) (criminal history).

Certainly using criminal history as a factor, Alexander, Nichols, and Maxwell all share a past conviction for the same conduct which demonstrated a predisposition to possess, handle, and brandish firearms, to inflict physical injury, a certain confidence to conduct a robbery, and all for the purpose of monetary gain.  To further bolster that claim, Alexander and Maxwell were suspected of an additional robbery, although the actual conviction resulted in different criminal conduct.  They are indeed similarly situated.

Defendants have failed to provide a single affidavit, study, statistic or report which opines that similarly situated defendants, meaning those who have robbed before, possessed and brandished firearms, with means to distribute illegal narcotics for personal monetary gain, were not prosecuted on the basis of their race in the Northern District of Ohio.  Defendants have failed to present "credible evidence" of discriminatory effect, nor have they even broached the second prong of purpose or intent.[28]

---

[28] See also United States v. Jones, 399 F.3d 640 (6th Cir. 2005) (upon remand of defendant's selective prosecution claim wherein defendant successfully challenged the district court's initial determination that no credible evidence of either intent of effect were present, United States v. Jones, 159 F.3d 969 (6th Cir. 1998)) and discovery ordered, Court determined even though credible evidence of discriminatory intent demonstrated by highly offensive and racially motivated actions of two police officers, a selective prosecution claim must fail without evidence of discriminatory effect; that similarly situated individuals of a different race were not similarly prosecuted.)

Furthermore, defendants fail to conduct any analysis based upon the particular facts of this case.  Defendants consistently ignore the critical fact that Alexander was the only defendant 'selected,' and such selection was based not upon his race, but his criminal history and reputation, his status under the ODRC security threat group of having a gang affiliation, his aggravated robbery conviction with a firearm, his drug possession conviction which factually described conduct constituting a robbery, his offer to sell a confidential informant a firearm, his later offer and actual sale of heroin, and his affirmation upon meeting with the undercover agent that he was interested in conducting a home invasion robbery of a drug stash house.  Thus, contrary to the defendants' conclusory accusations of selective prosecution, it was Alexander, not the government, who decided who the other participants in the robbery would be.[29]  Nichols was brought to the second meeting with ATF by Alexander.  Maxwell was brought to the third meeting with ATF by Alexander.  Chappell and Flowers were brought to the final meeting and arrest by Alexander, and/or Nichols and Maxwell.[30]  Even if Nichols and Maxwell successfully argue they were tangentially selected and encouraged to further attend meetings with law enforcement, they still share similar criminal history and predisposition as Alexander, are also identified as members of security threat groups, and also expressed a similar interest in conducting a home invasion robbery of a stash house when presented with the scenario.  For all of these reasons, the defendants' motion to dismiss the indictment based on selective prosecution, and request for discovery regarding selective prosecution, should be denied.

---

[29] Clearly, Alexander selected at least some of those associates—like Maxwell and Nichols—based upon his personal knowledge of their reputation and propensity to commit a violent robbery, which they have previously committed together.

[30] Nichols and Flowers admit they are cousins.  Flowers and Maxwell both admitted during post-arrest statements that it was Alexander who first told them about the robbery.

B.    ENTRAPMENT

"The central inquiry in entrapment cases is whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so." United States v. Pennell, 737 F.2d 521, 534 (6th Cir. 1984).  Thus, "[a] valid entrapment defense requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity."  United States v. Khalil, 279 F.3d 358, 364 (6th Cir. 2002).   The burden then shifts to the government to show predisposition, or that the defendant was already willing to commit the crime before being approached by government agents.  Jacobson v. United States, 503 U.S. 540, 553-54 (1992) (citations omitted).  It is a common-law defense, not a due process requirement, with predisposition standing as the principle element.  United States v. Russell, 411 U.S. 423, 433 (1973).  Indeed, a jury finding of predisposition is fatal to a claim of entrapment.  Id. at 436. While there are two elements, government inducement to commit a crime, and lack of predisposition to engage in the conduct, they are related.  Mathews v. United States, 485 U.S. 58 (1988).   To receive the entrapment jury instruction, a defendant must provide enough evidence to support both elements of entrapment.  Khalil, 279 F.3d at 364.

1.    Predisposition

In order to establish that any of the defendants were not predisposed to commit the crime, the Court must review: (1) the character or reputation of the defendant including his prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the government or another; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense which was overcome by government inducement or persuasion; and (5) the nature of the inducement or persuasion

30

supplied by the government.  See United States v. McLernon, 746 F.2d 1098, 112 (6th Cir. 1984)

(overruled on other grounds by United States v. Damra, 621 F.3d 474, 485 (6th Cir. 2010)).

There is ample evidence to demonstrate that Alexander, Nichols, and Maxwell were predisposed to commit the instant offense, as evidenced by their prior participation and conviction in an armed robbery, notwithstanding the additional facts of this case.  The 2009 aggravated robbery and weapon under disability convictions (and facts of the underlying incident) demonstrate their willingness to rob multiple individuals, to threaten with force and bodily harm, to brandish firearms, to strategically plan an attack and conceal their identities, all while motivated by a monetary payoff.  This particular incident also highlights their ability to formulate an agreement to work together in a criminal partnership.  This is further evidenced by the 2014 case involving Alexander and Maxwell, which while reported as a robbery, ultimately resulted in a drug conviction for Alexander.  Likewise, there is ample evidence to demonstrate that Chappell and Flowers were predisposed to commit the instant offense based upon the facts of the instant offense, and also considering Chappell's criminal history.

While the suggestion of the home invasion originated with the government, only Alexander can make that claim.  It was Alexander that suggested the criminal activity to the remaining defendants.  The decision of Nichols and Maxwell to meet with SA Zayas was predicated upon Alexander's decision to conduct the robbery.  On August 27, 2014, Alexander acknowledged that he had already informed Nichols of the potential robbery.  On September 2, 2014, Maxwell admitted that Alexander had already told him about the potential robbery prior to their respective meeting with SA Zayas.  The decision of Chappell and Flowers to appear on the day of the robbery was predicated upon Alexander's recruitment.  It belies common sense that Alexander, who brought Nichols and Maxwell to meetings with the agent to discuss the robbery,

31

would then bring Chappell and Flowers to an armed robbery, without first obtaining their agreement to conduct the robbery.  Indeed, Flowers admitted as much in his post-arrest statement; that Alexander had told him of the potential robbery a week prior.  Both Flowers and Chappell were in possession of a firearm, and Chappell was a prohibited person.  By all appearances, aside from Alexander, the potential robbery was initially suggested to the remaining defendants by Alexander.

Further evidence of Alexander's predisposition includes his first conversation with the informant; as he offered to sell the informant a firearm.  During the first meeting on August 25, 2014, he sold the informant heroin.  He displayed knowledge of the appropriate price for grams of heroin, and an ability to distribute narcotics.  He brought up the distribution of heroin again during the September 2, 2014 meeting with SA Zayas, himself and Maxwell.  He also has other convictions for possessing firearms.

There can be no doubt that the defendants were motivated by money from the potential distribution of cocaine as proceeds from the robbery.  During the September 3, 2014 car ride with the confidential informant and all defendants, there was discussion of money.  Alexander and Flowers each sang a line from a song entitled "All I care about" which has lyrics that reference money.[31]  In a post-arrest statement, Maxwell described himself as "thirsty (for money)."  He described the other defendants as "thirsty" as well.  A jury could "reasonably believe that no sane person would rob a stash house guarded by armed gang members to score some recreational drugs for personal use."  <u>United States v. Lewis</u>, 641 F.3d 773, 782 (7th Cir.

---

[31] "All I Care About" by Chief Keef: 'All I care about is money, all I care about is hundreds, fifties, and twenties.  All I care about is money.'

2011). See also United States v. Spagnola, 632 F.3d 981, 979 (7th Cir. 2011) (That the evidence may be uncertain as to how the defendants would sell the drugs does not upset the verdict.)[32]

There is absolutely no evidence that any defendant attempted to withdraw from the conspiracy, or displayed the slightest hesitation in carrying out the intended conduct. To the contrary, the defendants were given several opportunities to reconsider the decision to enter into the agreement to rob a stash house. SA Zayas asked Alexander and Nichols if they were willing and able to conduct the robbery. In fact, SA Zayas went so far as to ask Alexander, "And let me ask you this bro, 'cause I don't mean to insult you or nothin,' but I mean, you – you know what you're doing?" Alexander answered, "I promise you I know what I'm doin'." Nichols was also asked the same question and replied emphatically, "I know exactly what I'm doing." After discussing some elements of the potential robbery plan with Alexander and Maxwell, Maxwell indicated, "It's a rap man."

---

[32] Defendants have alleged that they were lured by the large payoff of 4 to 4.5 kilograms of cocaine. While this is factually correct because the defendants agreed to split the cocaine with SA Zayas, the law of conspiracy would hold them accountable for the eight to nine kilograms of cocaine. "It is settled that proof of an agreement between a defendant and a government agent or informer is not sufficient to support a conspiracy conviction. United States v. Pennell, 737 F.2d 521, 536 (6th Cir. 1984). However, the rule that government agents do not count as coconspirators is limited to situations in which the conspiracy involves only one defendant and a government informer. See United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987).

In the instant case, the defendants' culpability regarding the amount of cocaine is subject to general conspiracy law. The essence of conspiracy law is the agreement, not the accomplishment of the act. In Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court held that a co-conspirator may be vicariously liable for the substantive offense committed by coconspirator if the act is done "in furtherance of the conspiracy" and is "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Id. at 647-48, 66 S.Ct. 1180. Therefore the defendants agreed and conspired to steal eight to nine kilograms of cocaine and are responsible for that amount.

Additionally, it is important to note that Alexander admitted during his post-arrest statement that SA Zayas would never have received his portion of the "payoff." According to Alexander, he himself stated that the decision to keep all the kilograms of cocaine was his.

Perhaps the most important of the meetings which took place was the September 3, 2014 meeting with all defendants present just prior to their arrest.  All of the defendants participated in, and overheard their fellow co-conspirators, during the discussion of how the robbery would occur.  None expressed the slightest hesitation.  If anything, the conversation elevated to the level of violence.  Nichols asked SA Zayas if it was okay to just shoot the individuals inside the house.  When asked during his post-arrest interview if they were prepared to shoot anyone, Flowers responded, "If we had to, why not?"

Defendants allege that the inducement from the government was substantial because the robbery was "low risk" with an "exaggerated payoff" to defendants who were impoverished.  According to the defendants, such inducement was persistent and overcame any reluctance they had to commit the crime.  However, perhaps the best example of the defendants' collective lack of reluctance came from Alexander himself.   After the conversation SA Zayas had with all five defendants in the vehicle driven by the CI, while driving to where would ultimately be the site of their arrest, Alexander asked all of the defendants, "Any one of y'all right now don't want to go, give me that hammer (firearm) right now."  None of the defendants gave any indication of hesitation.   Certainly, Alexander's final question to his troops dispels any notion of reluctance that was overcome by the government's inducement.

Defendants erroneously interpret predisposition as requiring evidence that they would commit specifically a home invasion style robbery, as opposed to robbery generally.  (See Def. Motion to Dismiss, R. 39; PageID 341) ("In the present case, none of the defendants have prior convictions for stash house robberies or offense involving armed home invasions… Furthermore, there is nothing in the evidence to suggest that these defendants had knowledge of any other stash house or other similar potential robbery targets that would yield the type of payoff the

agent claimed they could recover from the phony stash house."    This "narrow and hyper-technical view of predisposition" was specifically rejected by the Sixth Circuit in United States v. Al-Cholan, 610 F.3d 945, 951 (6th Cir. 2010).  Predisposition evidence must be based on conduct 'near enough in kind to support the inference that the defendant's purpose included the offense of the sort charged' although not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted.  Id. (citing United States v. Brand, 467 F.3d 179, 200 (2d Cir. 2006)).

        2.      Inducement

Government inducement must be something more than "merely afford[ing] an opportunity or facilities for the commission of the crime."  Mathews, 485 U.S. at 66; see also United States v. Graham, 856 F.2d 756, 763 n.2 (6th Cir. 1988).  Defendants have exaggerated their theory of inducement in the instant case.  (See Def. Motion to Dismiss, R. 39; PageID 350).  In doing so, they have inaccurately characterized the undercover agent's statements regarding the crime as "easy" and "low risk."  They describe the conduct of the government as "manufacturing the entire crime" by demanding meetings, suggesting the use of firearms, providing transportation, all for a "large payoff."  To the contrary, on numerous occasions throughout the meetings, SA Zayas implored the defendants to understand that "they ain't gonna just hand it [cocaine] to you[.]"  SA Zayas indicated that at least one of the guards would be armed.  There was never an insistence that the defendants themselves be armed.  It was the defendants who elevated the stakes through their statements regarding shooting the guards inside the house.  The defendants were told that SA Zayas never saw money in the house, only cocaine.  Finally, the defendants demonstrated an ability to provide their own transportation during the several meetings before the day of their arrest.

Defendants also allege that it was the government who provided money to purchase the firearms.  During Alexander's post-arrest statement, he indicated that the confidential informant provided $900 to purchase guns.  However, $900 was the amount given to Alexander for the approximately 6.5 grams of heroin he sold to the informant.  How Alexander used that money is unknown to the government; however, he was never provided any monies for the sole purpose of purchasing firearms.

Again, the defendants make no distinction among themselves regarding inducement.  The level of "inducement" should be proportional to the extent of contact with the government agent.  Arguably, Alexander should have the most significant argument, and Flowers and Chappell should have the least significant.  Defendants cite Judge Posner's concurring and dissenting opinion in United States v. Kindle, 698 F.3d 401 (7th Cir. 2012).[33]  "The facts of this case support the contention that law enforcement agents offered an excessive inducement (4 to 4.5 kilos of cocaine) with very little risk to the defendants in this case, all of whom were desperately poor and lacking prospects.  Without such excessive inducement, these defendants would not have been inclined to commit such an offense, and never would have but for the sting."  (Def. Motion to Dismiss, R. 39; PageID 342).

Contrary to the defendants' assertions, however, there are a plethora of cases affirming the conviction of a defendant for conduct that he was predisposed to commit, without improper inducement by the government, either by a confidential informant or government agent.  United States v. Amawi, 695 F.3d 457 (6th Cir. 2012) (defendant convicted of conspiracy to kill and maim, and provide support in preparation of killing U.S. nationals despite fact that co-

---

[33] Judge Posner has concluded that "a sting operation is merely a theatrically elaborated method of deploying undercover agents in criminal investigations."  United States v. Hollingsworth, 9 F.3d 593, 597 (7th Cir. 1993) (citations omitted).

conspirator was paid confidential informant); United States v. Schaffer, 586 F.3d 414 (6th Cir. 2009) (defendant and co-defendant conspired with FBI agent posing as DOD contractor; motion to dismiss indictment for conspiring to commit computer fraud and transport stolen goods to obtain military secrets properly denied on numerous grounds); and Al-Cholan, 610 F.3d 945 (defendant's conviction for interstate transportation to engage in prostitution upheld as defendant was not entrapped by government agent posing as 12 year-old).

### 3.   Sentencing Entrapment

Based on their asserted defenses of entrapment and outrageous government conduct, which are legally and factually meritless, the defendants contend that the Court should ignore the Congressionally imposed mandatory minimum sentences set forth in 21 U.S.C. § 841 and 18 U.S.C. § 924(c) (2006).  The defendants' argument of "sentencing entrapment" or "sentencing manipulation" is has never been officially recognized by either the Supreme Court or the Sixth Circuit.  See Sosa v. Jones, 389 F.3d 644 (6th Cir. 2004) (Mr. Sosa has pointed to no Supreme Court precedent that clearly establishes' a federal prohibition of sentencing entrapment.) (citing Sorrells v. United States, 287 U.S. 435 (1932).   See also United States v. Jones, 102 F.3d 804 (6th Cir. 1996) (While other circuits have recognized sentencing entrapment, this circuit has never acknowledged sentencing entrapment as a valid basis for a downward departure under the guidelines.); United States v. Nanez, 168 F. App'x 72 (6th Cir. 2006) (Sentencing entrapment is a legal theory that has been recognized by neither this court nor the United States Supreme Court); and United States v. Gardner, 488 F.3d 700, 717 (6th Cir. 2007) (neither the Circuit nor the Supreme Court has even recognized the theory of sentencing entrapment); United States v. Mohanad Hammadi, 737 F.3d 1043 (6th Cir. 2013) (sentencing entrapment or manipulation have never been recognized as valid reasons to depart downward).

In <u>United States v. May</u>, 399 F.3d 817 (6th Cir. 2005), the defendant challenged his sentence alleging that the government's agent provided him with cooking utensils and waited until cocaine had been cooked and processed into crack cocaine before executing a search warrant at his residence.  May argued he was subjected to a higher penalty for crack cocaine and therefore should have been entitled to a downward departure based on the government's conduct. This argument was rejected, and for the same reasons, the defendants' argument should be rejected as well.

C.    <u>OUTRAGEOUS GOVERNMENT CONDUCT</u>

Outrageous government conduct implies that the actions of the government were so extreme as to violate a defendant's due process rights, regardless of predisposition.  <u>Russell</u>, 411 U.S. 423.  The defenses of entrapment and outrageous government conduct are two separate and distinct defenses.  A defendant may not simultaneously argue that he was induced to commit a crime and that the government engaged in outrageous misconduct; the two defenses are mutually exclusive.  <u>United States v. Tucker</u>, 28 F.3d 1420 (6th Cir. 1994) provides a thorough analysis of the two defenses, the history of the defenses, and the application of the defenses in other Circuits.  After a careful review of both defenses, the Court concluded:

> Based on the lack of binding precedent from either the Supreme Court or the Sixth Circuit, we are of the view that this panel is not required to recognize the "due process" defense. Moreover, there are three strong reasons for concluding that such a defense simply does not exist: (1) government conduct which induces a defendant to commit a crime, even if labelled "outrageous," does not violate that defendant's constitutional right of due process; (2) the district court lacked authority to dismiss the indictment for governmental misconduct where no violation of an independent constitutional right has been shown; and (3) continued recognition of this "defense" stands as an invitation to violate the constitutional separation of powers, intruding not only on the province of the Executive Branch but the Legislative Branch as well.

<u>Tucker</u> at 1426-27.

38

This analysis was revisited by the Sixth Circuit in <u>United States v. Warwick</u>, 167 F.3d 965 (6th Cir. 1999).  In <u>Warwick</u>, the defendant hired an undercover police officer as a hit man to seriously injure two people.  The undercover officer also portrayed himself as a drug dealer, which led to discussions between Warwick and the officer about distributing marijuana.  Warwick indicated he was able to acquire firearms and suggested he would sell a firearm to the officer.  Warwick met with the officer on many occasions and sold him marijuana during four of the meetings, which included exchanges of money and agreements to injure specific people.  Warwick also reluctantly sold the officer a firearm, which was later sold back to Warwick in exchange for more marijuana.  The district court agreed with Warwick that the government's conduct violated due process and dismissed a gun charge on that basis.  On appeal and the government's cross-appeal, Warwick argued that the officer's conduct during the course of the investigation was outrageous because the officer's involvement in 'creating' his crime was so significant as to violate due process.

The Sixth Circuit declined to overturn <u>Tucker</u> and determined, "The district court failed to realize that the circumstances under which we have rejected the outrageous government conduct defense are the very circumstances present in this case-where the defendant's outrageous government conduct defense sounds squarely in inducement."  <u>Id.</u> at 975.  While the dismissal of the gun count was ultimately upheld on other grounds, the decision reaffirmed <u>Tucker</u>, that a defendant alleging entrapment by the government may not simultaneously argue a Fifth Amendment due process violation.

The government is well within its investigatory powers to utilize undercover agents to enforce the law.  "It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the

prosecution.  Artifice and stratagem may be employed to catch those engaged in criminal enterprises."  <u>Sorrells</u>, 287 U.S. 435.  "Thus an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs and, if the offer is accepted, make an arrest on the spot or later.  In such a typical case, or in a more elaborate "sting" operation involving government-sponsored fencing where the defendant is simply provided the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition."  <u>Jacobson</u>, 503 U.S. 540 (citations omitted).

Clearly, panels prior to the <u>Tucker</u> and <u>Warwick</u> cases considered an outrageous government conduct defense, predicated upon <u>Russell</u>, 411 U.S. 423, and <u>United States v. Brown</u>, 635 F.2d 1207 (6th Cir. 1980), in which four factors to be considered in determining whether the conduct of police officers is so outrageous as to violate due process were articulated: (1) the need for the government conduct as shown by the type of criminal activity; (2) whether the criminal enterprise preexisted the police involvement; (3) whether the government agent directs or controls the enterprise; and (4) the impact of the police activity on the commission of the crime.  <u>See also United States v. Robinson</u>, 763 F.2d 778 (6th Cir. 1985); <u>United States v. Norton</u>, 700 F.2d 1072 (6th Cir. 1983), <u>cert. denied</u>, 461 U.S. 910 (1983).

<u>United States v. Payne</u>, 962 F.2d 1228 (6th Cir. 1992) is factually similar to the present case.  In <u>Payne</u>, an informant provided information to the government that his stockbroker laundered money.  The informant eventually introduced an undercover IRS agent to the stockbroker wherein they discussed laundering money.  In turn, the stockbroker introduced the agent to two other defendants, both attorneys, to assist with the scheme.  The agent provided the two defendants with $50,000 to launder.  The stockbroker later involved a fourth individual and

40

introduced him to the agent to recruit other individuals to launder money.  During all of the meetings with the defendants, the agent made it clear that the money to be laundered was acquired through illegal drug proceeds.  Ultimately, the <u>Payne</u> court employed the four-part test and determined the defense of outrageous government conduct was without merit.

Once one of the defendants has put into issue the government's actions, the government may counter the argument that the defendant was predisposed to commit the crime.  Specifically, the government may introduce evidence to rebut the defendant's claim that he was enticed or persuaded to commit a crime.  The government will request the Court conduct an analysis of the proffered evidence under Fed. R. Evid. 403 and 404(a) and/or (b).  The government may permissibly counter an entrapment defense with evidence of other crimes and wrongs in order to show criminal predisposition, although not specifically referred to Rule 404(b), but generally recognized.  <u>United States v. Blankenship</u>, 775 F.2d 735 (6th Cir. 1985).

<u>United States v. Franco</u>, 484 F.3d 347 (6th Cir. 2007), outlines the analysis the Court should conduct if the government intends to introduce evidence to rebut the entrapment defense.  In <u>Franco</u>, the Sixth Circuit indicated the preferred method would be for the district court to first conduct an analysis under Rule 403, although the failure to do so is not necessarily fatal.  Assuming the district court finds that the proposed evidence is sufficiently probative and is not substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury, the district court should then determine if the evidence is offered under Rule 404(a) (character trait) or (b)(other crimes).  <u>Id.</u> at 352-53.  It is important to note that only Rule 404(b) has a notice requirement.

The defendants' misguided and meritless arguments regarding outrageous government conduct are underscored by the inapposite and unpersuasive cases upon which they rely.  No

41

better example of this is found than in defendants' citation to <u>United States v. Hudson</u>, 3 F. Supp. 3d 772 (2014) in support of their motion to dismiss.  (<u>See</u> Defs. Mot. Dismiss, R. 39, PageID 347.)  The defendants failed to inform the Court that <u>Hudson</u> was reversed by the Ninth Circuit because the district court's decision was directly contrary to Ninth Circuit precedent concluding that reverse home invasion robbery stings, such as the one conducted here, do **<u>not</u>** amount to outrageous government conduct.  <u>See United States v. Dunlap, Nos. 14-50129, 14-50285, 2014 WL 6807733 (9th Cir. Dec. 4, 2014)</u> ("We have previously held that similar reverse-sting operations, if properly conducted, are a permissible law enforcement tactic") (citing <u>United States v. Black</u>, 733 F.3d 294, 309-10 (9th Cir. 2013); <u>United States v. Williams</u>, 547 F.3d 1187, 1201 (9th Cir. 2008)).  Thus, even the defendants' own cases do not support their position.  And for all of these reasons, their motion to dismiss the Indictment should be denied.[34]

---

[34] The failure to apprise the Court of the fact that <u>Hudson</u> is no longer good law is particularly troubling, given that the defendants, since the initial filing of their motion to dismiss, have clearly taken the time to troll legal databases for additional research on these issues.  (<u>See</u> Notice of Supp. Auth. in Supp. Defs. Mot. Dismiss Indictment and to Preclude Sent. Enhancement, R. 47.)

D.    SEVERANCE

1.  Severance of Convicted Felon in Possession of Firearm Counts 8-11.

None of the defendants dispute that, pursuant to Fed. R. Crim. P. 8 (a) or 8(b), they were properly joined with their co-defendants in the Indictment, or that the offenses in the Indictment were properly joined.  Defendants Alexander, Nichols, Maxwell, and Chappell, however, seek severance of Counts 8-11 of the Indictment charging those defendants respectively with violating 18 U.S.C. § 922(g)  (the "§ 922(g) counts"). (See Mot. Sever Counts 8-11, R. 40.) [35]  These Defendants seek severance pursuant to Fed. R. Crim. P. 14 only.  (See id., R. 40, PageID 360) (citing Fed. R. Crim. P. 14).  The defendants erroneously assert that joinder of the § 922(g) counts with the other counts of the Indictment is unduly prejudicial because, according to the defendants, evidence of the defendants' prior convictions, which is admissible in connection with the § 922(g) counts, would be inadmissible in connection with the other counts of the Indictment. The defendants also erroneously assert that a severance of the § 922(g) counts will not affect judicial economy.  This argument is based on the defendants' mistaken belief that the government's evidence in support of the § 922(g) counts is somehow distinct and separate from the evidence in support of the other counts of the Indictment.  None of these arguments have any merit, and the defendants' motion to sever the § 922(g) counts should be denied.

Rule 14(a) provides that if the joinder of offenses or defendants in an indictment appears to prejudice a defendant, the Court in its discretion may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice may require.  There is a preference for joint trials of defendants who are indicted together.  Zafiro v. United States, 506 U.S. 534, 537

---

[35] Defendant Flowers is not charged with a § 922(g) violation and therefore is not joined in this particular severance motion.  As such, references to the "defendants" in this section is intended to refer only to those defendants joined in the motion to sever the § 922(g) counts.

(1993); United States v. Cobleigh, 75 F.3d 242, 247 (6th Cir. 1996); United States v. Breinig, 70 F.3d 850, 852-53 (6th Cir. 1995).  Federal courts strongly favor joint trials of defendants who are indicted together because it promotes judicial efficiency and serves the interests of justice by avoiding the inequity of inconsistent verdicts. Zafiro, 506 U.S. at 537; Breinig, 70 F.3d at 852-53. The jury is presumed to be capable of following the Court's instructions, sorting out the evidence, and giving separate consideration to each charge against each individual defendant. United States v. Walls, 293 F.3d 959, 966 (6th Cir. 2002).

A strong policy presumption exists in favor of joint trials for co-defendants when the criminal charges result from the same acts and will be proved by the same evidence.  United States v. Critton, 43 F.3d 1089, 1098 (6th Cir. 1995); United States v. Moore, 917 F.2d 215, 220 (6th Cir. 1990).  This presumption is even more fundamental when the defendants, as in this case, are charged with joint participation in a conspiracy or common scheme.  United States v. Cope, 312 F.3d 757, 780 (6th Cir. 2002); United States v. Weiner, 988 F.2d 629, 634 (6th Cir. 1993).

Courts in this Circuit grant a severance of trials only if there is proof of a serious risk that a joint trial would compromise a specific trial right of a defendant, or prevent the jury from making a reliable judgment about a defendant's guilt or innocence.  Zafiro, 506 U.S. at 539; United States v. Delgado, 350 F.3d 520, 526 (6th Cir. 2003); Cope, 312 F.3d at 780; Walls, 293 F.3d at 966; United States v. Long, 190 F.3d 471, 476 (6th Cir. 1999).  Further, this Circuit recognizes that defendants who are indicted together do not have a right to severance and separate trials simply because they may have a better chance of acquittal if they are tried alone. Ross v. United States, 339 F.3d 483, 493 (6th Cir. 2003); Long, 190 F.3d at 476; United States v. Welch, 97 F.3d 142, 148 (6th Cir. 1996); Breinig, 70 F.3d at 853.  Finally, the precedent in this

Circuit indicates that a defendant is not entitled to severance of trials merely because the incriminating proof is greater against a co-defendant. <u>Breinig</u>, 70 F.3d at 853  To obtain a severance, the defendants bear the burden of showing factually specific and compelling prejudice that will mislead or confuse the jury.  <u>Welch</u>, 97 F.3d at 148; <u>Cobleigh</u>, 75 F.3d at 853; <u>Moore</u>, 917 F.2d at 221.  The defendants have fallen well short of meeting their burden of showing compelling prejudice and a need for severance of trials.

The defendants' severance motion does not even leave the starting line because they cannot establish any prejudice from joinder of the § 922(g) counts.  The defendants' sole assertion of prejudice is based on their erroneous belief that evidence of their prior convictions is admissible **<u>only</u>** in support of the § 922(g) counts.  In other words, the defendants contend that were it not for the joinder of the § 922(g) counts, the jury would not be informed of the fact that the defendants have prior convictions.  The defendants are simply wrong.  Evidence of the defendants' prior convictions is admissible in support of all counts of the Indictment because the evidence goes to the defendants' predisposition to commit the charged offenses, which rebuts the defendants' asserted defense of entrapment and/or outrageous government conduct.  The general rule, which is Fed. R. Evid. 404(b), is that an accused's character is generally not admissible for the purposes of producing action in conformity therewith.  However, when, as here, the defense of entrapment is asserted, prior convictions can be admitted to prove criminal predisposition. <u>Franco</u>, 484 F.3d at 350-52; <u>Blankenship</u>, 775 F.2d at 739.  Accordingly, contrary to the defendants' assertions, all of their prior convictions are admissible to rebut their asserted defense of entrapment.  Thus, the defendants' sole assertion of prejudice—that evidence of their prior convictions is only admissible because of joinder of § 922(g) counts—falls completely flat.  For this reason alone, their motion should be denied.

<div align="center">45</div>

With respect to defendants Alexander, Nichols, and Maxwell, evidence of their 2009 convictions for committing an armed robbery together, as well as Alexander and Maxwell's involvement in a separate uncharged robbery in 2014, is admissible for several additional reasons.  First, the evidence is admissible as background evidence.  "Background evidence" is admissible when it constitutes "a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." United States v. Hardy, 228 F.3d 745, 748 (6th Cir. 2000).  Proper background evidence "does not implicate Rule 404(b)." Id.  Evidence that defendants Alexander, Nichols, and Maxwell previously committed armed robberies together is admissible as background evidence to show that some of the co-conspirators were acquainted with each other.  See United States v. Miller, 48 F. App'x 933 (6th Cir. 2002) (the district court did not err in admitting as background evidence co-conspirator's testimony to show how other co-conspirators became acquainted, and how he eventually joined with defendant and others to purchase methamphetamine from other co-conspirator) (citing United States v. Paulino, 935 F.2d 739, 755 (6th Cir. 1991) (finding no abuse of discretion when the district court admitted testimony showing "how the conspirators became associated and how the conspiracy came about")); see also United States v. Toro, 133 F. App'x 181 (6th Cir. 2005) (held that the limited testimony regarding drug transactions between co-conspirators prior to the beginning of the conspiracy was proper background evidence because it "was necessary to show how one co-conspirator came to be acquainted with another co-conspirator and how their heroin-dealing relationship began.)

Second, this evidence is admissible under Fed. R. Evid. 404(b) as proof of defendants Alexander, Nichols, and Maxwell's knowledge, planning, intent and motive to commit the

charged offenses.  See Fed.R.404(b) (character evidence is admissible as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, and knowledge).  In connection with the conspiracy to commit the drug stash house robbery, which is the basis for Count 2 of the Indictment, the evidence is admissible to show these defendants' knowledge and intent to join the conspiracy, and the existence of a common plan or goal.  United States v. Hopper, 436 F. App'x 414 (6th Cir. 2011) (proof that co-defendants committed prior robberies held admissible under 404(b) to show knowledge and existence of planning in connection with conspiracy to commit § 924(c) violations and other crimes).  Indeed, the Eleventh Circuit held in a similar home-invasion robbery case that evidence that a defendant committed similar armed robberies to steal money and drugs with the same codefendants was "highly probative" of intent and admissible under 404(b).  United States v. Rodriguez, 452 F. App'x 883, 887 (11th Cir. 2012); see also United States v. Sterling, 738 F.3d 228, 239 (11th Cir. 2013), cert. denied, 134 S. Ct. 2682, 189 L. Ed. 2d 224 (2014) (held evidence of defendant's prior conviction for bank robbery was relevant and admissible under 404(b) to show defendant's intent to use the gun during the commission of the crime, as he had previously used a weapon when robbing another bank).  The evidence is further admissible to show these defendants knowingly used or carried firearms, which is an element of the § 924(c) counts.  See United States v. Wheeler, 349 F. App'x 92, 98 (6th Cir. 2009) (testimony about a prior robbery held to be harmless because testimony was admissible under Rule 404(b) to establish knowing possession of firearm); United States v. Chesney, 86 F.3d 564, 572-73 (6th Cir. 1996) (testimony about a prior robbery was admissible under Rule 404(b) to establish knowing possession of firearm); United States v. Davis, 415 F. App'x 709, 713 (6th Cir. 2011) ("We agree with the District of Columbia Circuit that in cases involving firearm possession by a felon, evidence that the defendant possessed a

gun at other times 'is often quite relevant to his knowledge and intent with regard to the crime charged'") (citing United States v. Cassell, 292 F.3d 788, 793 (D.C. Cir. 2002) (internal quotation marks and citation omitted)).  Finally, the evidence is admissible to show motive for committing the robbery, as the defendants had been recently released from prison on their 2009 armed robbery conviction and were searching for opportunities to make money.  Defendant Alexander even commented, during the car-ride to the final meeting before the robbery, that the robbery was going to put him back on his feet financially.  Defendant Maxwell, during his post-arrest statement, told investigators that he agreed to commit the robbery because he was "thirsty," meaning he was in need of money.  Thus, because the evidence of the defendants' prior convictions is admissible for a litany of reasons, regardless of the joinder of the § 922(g) counts, their motion for severance should be denied.

In support of their motion, the defendants cite nothing but inapposite cases from other jurisdictions that, contrary to the defendants' suggestion, do not support the severance relief they seek.  Indeed, the Sixth Circuit, in upholding a district court's denial of a severance of a § 922(g) charge, has rejected the reasoning of many of the cases upon which the defendants rely.  In United States v. Waagner, 104 F. App'x 521 (6th Cir. 2004), the Sixth Circuit recognized that, as defendants have cited, "[t]here is some support for the position that a decision not to sever charges based upon the defendant's status as a felon can be violative of a defendant's right to a fair trial under the Sixth Amendment."  Waagner, 104 F. App'x at 527 (citing United States v. Jones, 16 F.3d 487 (2d Cir. 1994)); United States v. Holloway, 1 F.3d 307, 312 (5th Cir. 1993); United States v. Daniels, 770 F.2d 1111, 1118 (D.C. Cir. 1985)).  The Sixth Circuit went on to recognize, however, that "[t]hese courts have also emphasized the degree of connection between the felon-in-possession charges and the other charged offense. A key justification for concluding

that the prosecution was attempting to bootstrap felon-in-possession charges in an attempt to taint defendants in the prosecution of related charges was the court's recognition of the tenuousness between the offenses."  The Sixth Circuit ultimately denied the defendant's severance motion because "Fed. R. Crim. P. 8(a) specifically allows offenses that 'constitute parts of a common scheme or plan' to be charged in the same indictment."  And because the Sixth Circuit concluded that the other charges in the indictment were "part of the same overall scheme undertaken by defendant" and "not tenuously connected to [the defendant's] indictment for possession of weapons," the court denied the severance motion.  Id.  The same conclusion is compelled here.

The defendants do not—and indeed cannot—dispute that the § 922(g) counts are properly joined under Fed. R. Crim. P. 8(a) (b).  The § 922(g) counts are undisputedly part of a common scheme or plan to commit the robbery of a drug stash house.  The firearms that are charged in the § 922(g) counts are among the tools the defendants were going to use to carry out the drug stash house robbery—which, of course, forms the basis for the drug conspiracy count (Count 2) and the § 924(c) counts (Counts 3-7).  To that end, the § 922(g) counts are anything but "tenuously connected" to the other counts of the Indictment.  Waagner, 104 F. App'x at 527.  Because the defendants' severance motion is without legal basis, it should be denied.[36]

---

[36] Defendants also cite in their motion United States v. Lewis, 787 F.2d 1318 (9th Cir. 1986).  Lewis is completely inapposite because the entire holding of the case is predicated on the assumption that evidence of the defendant's conviction is *only* admissible on the felon in possession charge.  Lewis, 787 F.2d at 1321 ("There is 'a high risk of undue prejudice whenever ... joinder of counts allows evidence of other crimes to be introduced in a trial of charges *with respect to which the evidence would otherwise be inadmissible*'" (Daniels, 770 F.2d at 1116 (emphasis added). Because, as stated above, the defendants' convictions are admissible on all charges of the Indictment for a variety of reasons, Lewis does not support the defendants' request for a severance under Fed. R. Crim. P. 14 based on prejudice associated with joinder of the 922(g) counts.

Finally, even if the defendants could establish *any* prejudice from the joinder of the §

922(g) counts, which they cannot, that prejudice does not outweigh the interest of judicial

economy in conducting a joint trial here.  See Zafiro, 506 U.S. at 540 ("Rules 8(b) and 14 are

designed to promote economy and efficiency and to avoid a multiplicity of trials, [so long as]

these objectives can be achieved without substantial prejudice to the right of the defendants to a

fair trial.") (internal quotation and citation omitted).  The defendants' contention that a severance

of the § 922(g) counts would not affect judicial economy is completely meritless.  Contrary to

the defendants' understanding, in the event the § 922(g) counts were to be severed, the

government would still need to put on the exact same case it would if the § 922(g) counts were

not severed.  That is because in any trial of the § 922(g) counts the government would explain

the reason why the defendants possessed their weapons, *i.e.* the home invasion robbery plan.  In

other words, the government would not—and should not be ordered to—try the case of the §

922(g) counts in a vacuum.  To that end, the government would not begin the story, as the

defendants seem to believe, at the end of the home invasion robbery scheme when the defendants

flee from law enforcement at the final meeting location.  Because the defendants cannot establish

any legal or factual basis for a severance, and because such a severance would substantially and

negatively affect judicial economy, the defendants' motion for a severance of the § 922(g) counts

should be denied.

### 2. Severance Pursuant to Bruton v. United States.

Following their arrest, the defendants each gave statements to law enforcement.  The

defendants contend that because some of these statements implicate other defendants, a

severance pursuant to the Supreme Court's holding in Bruton v. United States, 391 U.S. 123

(1968) is the only adequate remedy.  The defendants' contention is without merit.  Before

introducing any of the defendant's statement at trial, the government is prepared to redact the statements so that they longer present <u>Bruton</u> concerns.  Moreover, to the extent necessary, the government is prepared to introduce parts of the defendants' post-arrest statements through the testimony of the interviewing agent(s) only, in a manner that also does not raise <u>Bruton</u> concerns.  For these reasons, the defendants' motion should be denied.

In <u>Bruton</u>, the Supreme Court determined that the introduction of a post-arrest statement of a non-testifying co-defendant into evidence at a joint trial which inculpates another defendant violates the Confrontation Clause.  However, contrary to the defendants' assertions, <u>Bruton</u> does not stand for the proposition that the introduction of such a statement will always violate the Confrontation Clause and therefore mandates a severance in every case.

A co-defendant's statement may be introduced in the government's case-in-chief against another defendant if the statement is redacted.  While the confession of a non-testifying co-defendant that expressly implicates another defendant is prohibited by <u>Bruton</u>, a statement which is not incriminating on its face is not prohibited.  <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987).

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability-advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. The other way of assuring compliance with an expansive <u>Bruton</u> rule would be to forgo use of co-defendant confessions. That price also is too high, since confessions "are more than merely 'desirable'; they are essential to society's

> compelling interest in finding, convicting, and punishing those who violate the law.

Richardson at 210.

In the present case, the government concedes that the defendants' post-arrest statements implicate Bruton, at least in part.  However, the government will redact these statements in a way that renders them admissible.  The government will introduce redactions of the defendants' statements to include each defendant's statement regarding their individual role(s) in the crime, and any statements that others were involved, without specifically identifying by name any other co-defendant. The government will also include any of the defendants' statements regarding the existence of the conspiracy, which can be introduced without stating who the members of the conspiracy were or specifically what roles the other co-defendants played.  Such redactions are permissible under Richardson and Bruton.[37]

The government proposes to introduce the defendants' statements without reference to any co-defendant by name; without using a symbol, blank space, or word such as "deleted," and without reference to what another co-defendant said to either of them.  See Gray v. Maryland, 523 U.S. 185 (1998).  The government is in the process of transcribing each defendant's entire statement, with a line-by-line redaction of those statements which refer to another co-defendant by name, or that co-defendant's actions.  Each attorney may then review the redacted statement, and if there are still objections to the redacted statement, the parties can request the Court to conduct a final review regarding the redacted statements.  See United States

---

[37] It is important to consider that in this case there is separate, overwhelming evidence linking the defendants to the crime, including but not limited to the various audio/video recordings of the defendants meeting with the undercover team to discuss the robbery plan in detail.  As such, there is less probability that a jury will erroneously draw a conclusion that some or all of the defendants were involved in the crime simply based on a redacted post-arrest statement.

v. Sherlin, 67 F.3d 1208 (6th Cir. 1995) and Cobleigh, 75 F.3d 242.  Moreover, to the extent necessary, the government is prepared to introduce parts of the defendant's post-arrest statements through the testimony of the interviewing agent(s) only, in a manner that does not raise Bruton concerns.

Finally, the Court should provide a limited jury instruction that the post-arrest statement of one defendant is not evidence of guilt as to any other defendant. The instruction should be given at the time the statement is introduced and again at the close of all evidence. Indeed, the Sixth Circuit Pattern Jury Instruction 7.08 contemplates the testimony of a co-conspirator and cautions a jury to consider the testimony "with more caution than the testimony of other witness."

A jury may not convict a defendant based upon the unsupported testimony of such a witness, standing alone, unless believed beyond a reasonable doubt. The use of a post-arrest statement is akin to co-conspirator testimony, and in fact, a redacted statement is less prejudicial than the direct testimony. Richardson supports and favors the use of such a limiting instruction. Juries are presumed to follow their instructions, and are often instructed on the limitations of evidence and what purpose it may be considered.  Francis v. Franklin, 471 U.S. 307 (1985).  For all of these reasons, the defendant's severance motion pursuant to Bruton should be denied.

E.    DISCLOSURE OF CONFIDENTIAL INFORMANT

1.    Confidential Informant Statements

The defendants move to exclude any out of court statements of the confidential informants that participated in this investigation.  The defendants erroneously contend that any use of the confidential informants' statements at trial will constitute hearsay and implicate the defendants' rights to confront witnesses pursuant to Crawford v. Washington, 541 U.S. 36 (2004).  The defendants' motion is entirely without merit.  Contrary to the defendants'

assertions, to the extent the government seeks to introduce at trial the statements of the confidential informants, it will be for nonhearsay purposes.  Because these statements will be offered for nonhearsay purposes, they do not, as a matter of law, concern the defendants' right to confront witnesses.  Accordingly, the defendants' motion should be denied.

The government may seek to introduce certain statements of the confidential informants to provide background information and to explain how and why the ATF came to investigate the defendants.  In doing so, these statements will not be offered "for the truth of the matter asserted," and are therefore considered nonhearsay.  See Fed. R. Evid. 801(c).  Indeed, the Sixth Circuit has specifically sanctioned the use of such out-of-court statements to the extent that they are "only offered to construct the sequence of events leading up to the drug transaction." United States v. Aguwa, 123 F.3d 418, 421 (6th Cir. 1997) (citing United States v. Evans, 883 F.2d 496, 501 (6th Cir. 1989)).  "[I]n some circumstances, out-of-court statements offered for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay." United States v. Gibbs, 506 F.3d 479, 486-87 (6th Cir. 2007) (quoting United States v. Martin, 897 F.2d 1368, 1371 (6th Cir. 1990)).

The use of any confidential informant statements for this nonhearsay purpose does not raise Confrontation Clause concerns.  The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)) (defendant's rights under the Confrontation Clause were not violated by introduction of an accomplice's confession for the nonhearsay purpose of rebutting defendant's testimony that his own confession was coercively derived from the accomplice's statement)).  The Sixth Circuit has held that evidence offered for background, to explain how certain events came to pass, or to give context

54

to law enforcement officers' actions is not offered for the truth of the matter asserted and does not trigger a Confrontation Clause violation. See United States v. Warman, 578 F.3d 320, 346 (6th Cir. 2009) (quoting United States v. Cromer, 389 F.3d 662, 676 (6th Cir. 2004)).

The government will further seek to introduce certain statements of the confidential informants as nonhearsay to put in context the recordings of the various meetings and phone calls between the defendants and the undercover team.  Not surprisingly, much of the government's evidence at trial will be the recordings of the meetings and phone calls between the defendants and the confidential informants and undercover agent.  Of course, the defendants' statements contained in these recordings are admissible as either admissions of a party opponent (Fed. R .Evid. 801(d)(2)(A)) or co-conspirator statements (Fed. R. Evid. 801(d)(2)(E)), or both. The recorded statements of the confidential informants, on the other hand, will be offered only to provide context and give meaning to the admissible responses of the defendants.  The Sixth Circuit has held that, in this context, the confidential informants' statements are not "offered into evidence to prove the truth of the matter asserted," under Fed. R. Evid. 801(c), and therefore their admission does not violate the hearsay rule.  United States v. Sexton, 119 F. App'x 735, 743 (6th Cir. 2005) (citing United States v. McDonald, Nos. 97–5339, 5556, 5338, 5187, 5196, 1999 WL 149658, at *9 (6th Cir. Mar. 1, 1999) (collecting cases); United States v. Johnson, 71 F.3d 539, 543 (6th Cir. 1995); United States v. Martin, 897 F.2d 1368, 1372 (6th Cir. 1990)). And again, because the confidential informants' statements are not being offered for their truth, they do not raise Confrontation Clause concerns.  Martin, 897 F.2d at 1372 (citations omitted). For all of these reasons, the defendants' motion to exclude out of court statements of the confidential informants should be denied.

2.    <u>Disclosure of Confidential Informant Identity</u>

Defendants seeks an order requiring the United States to reveal the identities of the two (2) confidential informants involved in this investigation.  In support of this request, the defendants provide no specifics whatsoever regarding the information the confidential informants could purportedly provide that would assist the defense.  Rather, the defendants offer nothing but conclusory and speculative assertions that the "the informants' identity and involvement greatly affects the case against the defendants," and "the informants' unrecorded interactions with the defendants **may well** be material and favorable to the defense."  (See Mot. Disc. Confid. Informants, R. 34, PageID 295) (emphasis added).  These unsubstantiated assertions do not warrant the disclosure of the confidential informants involved in this investigation, especially given the recent, serious and specific threats at least one the informants has received in connection with their work as a confidential informant.  For all of these reasons, the defendants' motion should be denied.

In <u>Roviaro v. United States</u>, 353 U.S. 53 (1957), the U.S. Supreme Court recognized the government's privilege to withhold from disclosure the identity of non-testifying persons who furnish information of criminal activities to law enforcement officials.  The purpose of the privilege is to aid law enforcement efforts by encouraging citizens to communicate their knowledge of criminal activities to law enforcement officials.  <u>Id.</u>; <u>see also</u> <u>United States v. United States v. Jenkins</u>, 4 F.3d 1338, 1341 (6th Cir. 1993); <u>United States v. Moore</u>, 954 F.2d 379, 381 (6th Cir. 1992); <u>United States v. Straughter</u>, 950 F.2d 1223, 1232 (6th Cir. 1991).  The privilege, however, is limited by fundamental requirements of fairness, and the Supreme Court recognized that disclosure of a non-testifying informant's identity "must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defense, the possible significance of the informant's testimony and other relevant factors."  <u>Straughter</u>, 950

56

F.2d at 60-62; Jenkins, 4 F.3d at 1341-42; Straughter, 950 F.2d at 1232 (danger to the informant must be given significant weight under the Roviaro test); Moore, 954 F.2d at 381; United States v. Sharp, 778 F.2d 1182, 1185 (6th Cir. 1985). The determination rests within the sound discretion of the trial court. United States v. Cummins, 912 F.2d 98, 103 (6th Cir. 1990); Sharp, 778 F.2d at 1187. The Sixth Circuit has held that the privilege is especially important in the enforcement of controlled substance laws where there is usually no complaining witness. Jenkins, 4 F.3d at 1341 (citing United States v. Lloyd, 400 F.2d 414, 415 (6th Cir. 1968)).

The burden of establishing the need for disclosure of an informant's identity is upon the party who seeks it. Sharp, 778 F.2d at 1187. The party seeking disclosure must demonstrate that the informant's identity is "**essential** to a fair trial." See Moore, 954 F.2d at 381 (emphasis added) (citation omitted). A mere general request for disclosure of an informant's identity, as is the case here, is insufficient. United States v. Smith, 90 F. App'x 120, 125 (6th Cir. 2004) (holding that the denial of any defense motion to compel disclosure of informant's identity is not an abuse of discretion where defendant made no showing as to how such disclosure would substantively assist the defense). Additionally, "speculation" of helpfulness—again the case here—is also insufficient. United States v. Williams, 898 F.2d 1400, 1402 (9th Cir. 1990). "The defendant must explain to the court as precisely as possible what testimony he thinks the informer could give and how this testimony would be relevant to a material issue of guilt or innocence." United States v. Blevins, 960 F.2d 1252, 1259 (4th Cir. 1992); Moore, 954 F.2d at 380-81 (holding that district court properly refused to compel disclosure of confidential informant because defendant advanced no more than a simple statement that the informant's testimony might assist the defense).

Where, as in this case, the defendants claim entrapment, they must adduce some evidence of entrapment before the government is called upon to disclose to the defendant the identity of an informant.  <u>Sharp</u>, 778 F.2d at 1187 (citation omitted).  "Mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure."  <u>Id.</u> Furthermore, if the evidence upon which a defendant is convicted was secured personally by government agents who will testify, the government is not required to produce the cooperating individual.  <u>Moore</u>, 954 F.2d at 381 (citing <u>United States v. Craig</u>, 477 F.2d 129, 131 (6th Cir. 1973)).

Here, the defendants have come nowhere near meeting the high burden of establishing a need to know the identities of the confidential informants in this case.  The defendants offer nothing but unsubstantiated assertions of counsel in support of their request for the identity of the confidential informants.  In order to establish a need for the informants' identities, defendants must show much more than that the "informants' unrecorded interactions with the defendants **may well** be material and favorable to the defense  (See Mot. Disc. Confid. Informants, ECF 34, PageID 295) (emphasis added).  According to the well-established case law set forth above, this is sort of pure speculation on behalf of the defendants not enough to warrant the extraordinary remedy of piercing the confidential informant privilege.  Because the defendants do not articulate precisely how the disclosure of the informants' identities is necessary to answer the charges in the Indictment, or otherwise essential to ensure fair proceedings, their motion should be denied.

The defendants appear to seek the identities of the informants in a desperate attempt to bolster their meritless entrapment defense.  However, because their entrapment defense is entirely without basis—both legally and factually—the defendants have not and cannot offer any evidence in support of  the defense.  Because the defendants have not come forward with at least

some evidence to support their entrapment defense, the government is not required to disclose the confidential informants.  Sharp, 778 F.2d at 1187 (citation omitted).

Furthermore, contrary to the defendants' suggestion, there are not significant unrecorded contacts between the confidential informants and the defendants.  In fact, nearly all of the contacts with the defendants involved both a confidential informant and the undercover special agent, and these contacts were recorded.  The government will not only introduce these recordings at trial, but will also call the undercover agent to testify and be subject to cross-examination.  Accordingly, because most, if not all of, the evidence the government will offer at trial was secured personally by government agents who will testify, the government is not required to produce the cooperating informants. Moore, 954 F.2d at 381 (citing United States v. Craig, 477 F.2d 129, 131 (6th Cir. 1973)).

Finally, the government will supplement this response with a sealed ex-parte filing setting forth the government's concerns regarding the personal safety of the informants and the integrity of on-going investigations.  The Sixth Circuit has held that such safety and investigative concerns are an additional reason not to compel the disclosure of a confidential informant, Straughter, 950 F.2d at 1232 (danger to the informant must be given significant weight under the Roviaro test), especially in a narcotics related case such as this, where the Sixth Circuit has held the informant privilege is especially important. Jenkins, 4 F.3d at 1341 (citation omitted).  For all of these reasons, the defendants' motion should be denied.

F.    EXCLUSION OF 404(B) MATERIAL

The defendants have filed a boilerplate motion seeking to exclude any evidence of the defendants' prior convictions or other bad acts pursuant to Fed. R. Evid. 404(b).  The defendants' motion should be denied for several reasons.

Fed. R. Evid. 404(b) provides, in pertinent part, that evidence of other crimes, wrongs, or acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Sixth Circuit employs a three-part test to determine the admissibility of Rule 404(b) evidence:

> First, the district court must decide whether there is sufficient evidence that the other act in question actually occurred. Second, if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. Third, if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

United States v. Trujillo, 376 F.3d 593, 605 (6th Cir. 2004) (citations omitted). Moreover, the district court should reduce the prejudicial nature of the other acts evidence by instructing the jury to consider the evidence only for the limited purposes for which it was admitted. See United States v. Bell, 516 F.3d 432, 445 (6th Cir. 2008); Huddleston v. United States, 485 U.S. 681, 691-92 (1988).

Rule 404(b) is a "rule of inclusion rather than exclusion, since only one use is forbidden and several permissible uses of such evidence are identified." Blankenship, 775 F.2d at 739. The district court "has broad discretion in determining whether evidence is admissible under Rule 404(b)." United States v. Cummins, 969 F.2d 223, 226 (6th Cir. 1992).

In order for evidence to be admissible under Rule 404(b), it must be relevant. See Huddleston, 485 U.S. at 689. Pursuant to Fed. R. Evid. 401, "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In the context of Rule 404(b), prior acts evidence "is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." Huddleston,

485 U.S. at 689.  As such, the evidence need only be sufficient for a jury to find by a preponderance of the evidence that the defendant committed the other bad acts.  See Huddleston, 485 U.S. at 687; Trujillo, 376 F.3d at 605.

Moreover, "[w]ithin limits delineated in the Federal Rules of Evidence, the government is entitled to introduce all relevant, probative evidence at its disposal."  United States v. Burgess, 576 F.3d 1078, 1099 (10th Cir. 2009).  Indeed, "[t]he defense cannot be heard to complain that the government has produced too much evidence of guilt." Id.  And although the prior act or crime admitted pursuant to Rule 404(b) must be reasonably near in time to the offenses charged in the indictment, "there is no absolute maximum number of years that may separate a prior act and the offense charged."  United States v. Jones, 403 F.3d 817, 821 (6th Cir. 2005) (quoting United States v. Ismail, 756 F.2d 1253, 1260 (6th Cir. 1985)); United States v. Love, 254 F. App'x 511 (6th Cir. 2007).

Finally, whether admitted under Rule 404(b) or as "intrinsic" evidence, other acts evidence must still be judged under Fed. R. Evid. 403.  Fed. R. Evid. 403 provides, "[a]lthough relevant, evidence may be excluded if its probative value is **substantially** outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis added).  "In weighing the probative value of evidence against the dangers and considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission."  United States v. Dennis, 625 F.2d 782, 797 (8th Cir. 1980).  Again, the district court has "broad discretion" in determining whether the danger of undue prejudice outweighs the probative value of the evidence.  United States v. Vance, 871 F.2d 572, 576 (6th Cir. 1989).

Evidence is considered unfairly prejudicial if it will "cause the jury to decide the case on an improper basis rather than on the evidence." United States v. Collins, 604 F.3d 481, 487 (7th Cir. 2010).  In other words, unfair evidence has the capacity to lure the fact finder into convicting on a "ground different from proof specific to the offense charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997).  The Sixth Circuit has rejected claims of unfair prejudice under Rule 403 "because the challenged evidence was contrary to [the defendant's] view of the facts." United States v. Schrock, 855 F.2d 327, 335 (6th Cir. 1988).  Indeed, "[u]nfair prejudice, as used in Rule 403, does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis."  United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir. 1986).  See also United States v. Holden, 557 F.3d 698, 705 (6th Cir. 2009) ("Evidence that undermines one's defense by virtue of its legitimate probative force does not unfairly prejudice the defendant.") (internal quotation and citation omitted).  In short, "[e]vidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to Rule 403." United States v. Chambers, 441 F.3d 438, 456 (6th Cir. 2006) (emphasis added).

Here, evidence of the defendants' prior convictions is admissible for at least two reasons that are beyond the stricture of Rule 404(b).  First, this evidence is admissible because it goes to rebut the defendants' asserted defense of entrapment and/or outrageous government conduct. Second, with respect to defendants Alexander, Nichols, and Maxwell's prior convictions for committing armed robberies together, the evidence is admissible as "background evidence" to demonstrate how and why these co-conspirators were acquainted with and knew each other.  For these reasons alone, the defendants' motion can and should be denied without even needing to conduct an analysis of this evidence's admissibility under Rule 404(b).

The general rule, which is embodied in Rule 404(b), is that an accused's character is not admissible for the purposes of producing action in conformity therewith.  However, when, as here, the defense of entrapment is asserted, prior convictions can be admitted to prove criminal predisposition.  Franco, 484 F.3d at 350-52; Blankenship, 775 F.2d at 739.  Accordingly, contrary to the defendants' assertions, all of their prior convictions are admissible to rebut their asserted defense of entrapment.

Next, with respect to defendants Alexander, Nichols, and Maxwell, evidence of their prior convictions for committing an armed robbery together in 2009 is admissible as background evidence.[38]  Similarly, with respect to defendant Alexander and Maxwell, evidence that they possessed a weapon and committed a separate armed robbery together in 2014 is also admissible as background evidence.[39]  "Background evidence" is admissible when it constitutes "a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense."  Hardy, 228 F.3d at 748.  Proper background evidence does not implicate Rule 404(b).  Id.  Evidence that defendants Alexander, Nichols, and Maxwell previously committed armed robberies together is admissible as background evidence to show that these co-conspirators were acquainted with and knew each other.  See Miller, 48 F. App'x 933 (the district court did not err in admitting as background evidence of co-conspirator's testimony to show how other co-conspirators became acquainted, and how he eventually joined with defendant and others to purchase methamphetamine from other co-conspirator) (citing United States v. Paulino, 935 F.2d 739, 755 (6th Cir. 1991) (finding no abuse of discretion when the

---

[38] The facts surrounding these convictions are set forth at page 5, supra.

[39] The facts surrounding this criminal incident are set forth at pages 8-9, supra.

district court admitted testimony showing "how the conspirators became associated and how the conspiracy came about")); see also Toro, 133 F. App'x 181 (held that the limited testimony regarding drug transactions between co-conspirators prior to the beginning of the conspiracy was proper background evidence because it "was necessary to show how one co-conspirator came to be acquainted with another co-conspirator and how their heroin-dealing relationship began.)  For these two reasons alone, the defendants' Rule 404(b) motion should be denied.

Evidence of that defendants Alexander, Nichols, and Maxwell's previously committed armed robberies together is also admissible under Rule 404(b) for several permissible reasons. First, the evidence is admissible as proof of defendants Alexander, Nichols, and Maxwell's knowledge, intent, and planning to commit the charged offenses.  Conspiracy is a specific intent crime which requires the government to show the defendants had the specific intent to further the common unlawful objective of the conspiracy.  See, e.g., United States v. Merriweather, 78 F.3d 1070, 1078 (6th Cir. 1996).  To prove a conspiracy the government is also required to prove the existence of a common plan or objective.  See Damra, 621 F.3d at 498(describing a conspiracy under 18 U.S.C. § 371).  The Sixth Circuit has held that in a case like this, charging the defendants with conspiracy to commit robbery, evidence that the defendants committed prior robberies together is admissible to show knowledge, intent, and planning in connection with the charged conspiracy.  See Hopper, 436 F. App'x 414 (proof that co-defendants committed prior robberies held admissible under 404(b) to show knowledge and existence of planning in connection with conspiracy to commit § 924(c) violations and other crimes).  Therefore, here, evidence that defendants Alexander, Nichols, and Maxwell committed prior armed robberies together is admissible to show their knowledge and intent and the existence of a common plan or goal in connection with the conspiracy to commit the drug stash house robbery, which is the

basis for Count 2 of the Indictment.    Indeed, the Eleventh Circuit recently held, in a similar home-invasion robbery case, that evidence that a defendant committed similar armed robberies to steal money and drugs with the same codefendants was "highly probative" of intent and admissible under Rule 404(b).  Rodriguez, 452 F. App'x at 887; see also Sterling, 738 F.3d at 239 (held evidence of defendant's prior conviction for bank robbery was relevant and admissible under 404(b) to show defendant's intent to use the gun during the commission of the crime, as he had previously used a weapon when robbing another bank).

Similarly, in order to prove the § 922(g) counts the government must show the defendants knowingly possessed firearms, and in order to prove the § 924(c) counts, the government must show, among other things, that the defendants knowingly used or carried firearms.  The fact that defendants Alexander, Nichols, and Maxwell previously possessed and used firearms in connection with armed robberies is highly probative of their knowledge to possess and use firearms in connection with these charges.  The Sixth Circuit has held, in similar cases involving firearms offenses, that evidence of a defendant's prior possession or familiarity with firearms is admissible to show the defendant's knowledge and intent with regard to the crime charged.  See Wheeler, 349 F. App'x at 98 (testimony about a prior robbery held to be harmless because testimony was admissible under Rule 404(b) to establish knowing possession of firearm); Chesney, 86 F.3d at 572-73 (testimony about a prior robbery was admissible under Rule 404(b) to establish knowing possession of firearm); Davis, 415 F. App'x at 713 ("We agree with the District of Columbia Circuit that in cases involving firearm possession by a felon, evidence that the defendant possessed a gun at other times 'is often quite relevant to his knowledge and intent with regard to the crime charged'") (citing United States v. Cassell, 292 F.3d 788, 793 (D.C. Cir. 2002) (internal quotation marks and citation omitted)).

Evidence of defendants Alexander, Nichols, and Maxwell's prior armed robbery conviction is further admissible under Rule 404(b) to show motive for committing the drug stash house robbery.  When this investigation began, the defendants had been recently released from prison on their 2009 armed robbery conviction.  Therefore, the defendants were searching for opportunities to make money.  This plan of robbing a drug stash house and converting the stolen drugs into cash presented the perfect opportunity for the defendants.  Indeed, defendant Alexander even commented, during the car-ride to the final meeting before the robbery, that he "needed this bitch [the robbery]," and the robbery was going to put him back on his feet financially.  Defendant Maxwell also indicated in his post-arrest statement that he and the other defendants were "thirsty" (in need of money), and therefore agreed to participate in the robbery. It is no wonder defendant Alexander recruited his prior robbery associates—Nichols and Maxwell—to join him in another armed robbery plan.

Finally,  this highly probative evidence of the defendants' prior convictions for armed robberies and firearms offenses is not outweighed—and certainly not substantially outweighed— by the prejudice to the defendants.  In fact, there can be no unfair prejudice from the introduction of this evidence because it is the defendants, not the government, who have put the defendants' character at issue by asserting the defense of entrapment.  Thus, the prejudice to the defendants' entrapment defense that may arise from the jury learning that defendants Alexander, Nichols, and Maxwell were previously convicted for committing an armed robbery together is not unfair because it arises solely from the probative force of the character evidence.  Mendez-Ortiz, 810 F.2d at 79 ("[u]nfair prejudice, as used in Rule 403, does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis");  Holden, 557 F.3d at 705 ("Evidence

that undermines one's defense by virtue of its legitimate probative force does not unfairly prejudice the defendant.")  Second, any prejudice that would arise from this evidence can be cured through a proper jury limiting instruction informing the jury they can only consider the evidence for specified purposes.  The Sixth Circuit has repeatedly upheld the introduction of similar evidence under Rule 404(b) where such an instruction has been given.  Chesney, 86 F.3d at 573 (holding probative value of testimony about a prior robbery was not substantially outweighed by prejudice where district court gave limiting instruction); Davis, 415 F. App'x at 713 (testimony about prior gun possession not substantially outweighed by prejudice where district court gave cautionary instruction);  Hopper, 436 F. App'x at 422 (proof that co-defendants committed prior robberies held admissible under 404(b), and not substantially outweighed by prejudice, where district court gave two separate cautionary instructions).  For all of these reasons, the defendants' motion should be denied.

      G.      <u>DISCOVERY REQUESTS</u>

          1.  <u>Motion for Production of Brady Information and Giglio Information</u>

The defendants have filed routine discovery motions that, in essence, simply request that the Court order the government to comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972) and their progeny to disclose exculpatory information (hereinafter, "Brady information") and certain impeachment information relating to government witnesses (hereinafter, "Giglio information").  (See Joint Motion for Disclosure of Impeaching Information, R. 36; Motion for Production of Brady Material, R. 44.)  Such an order is improper and unnecessary, and these motions should be denied.

The government has complied with its obligations under Fed. R. Crim. P. 16 and Brady. To that end, the government has already produced substantial discovery in this matter, including 43 CDs containing audio and video recordings of the defendants, investigative reports, photographs, criminal history records, and other discovery materials.  (See Gov.'s Resp. to Defs' Request for Discovery, R. 24.)  In fact, the government has gone beyond its obligations under Rule 16 and Brady and produced recorded, post-arrest statements of co-defendants, which are generally considered to be not discoverable.  See United States v. Wilkerson, 456 F.2d 57, 61 (6th Cir.), cert. denied, 408 U.S. 926 (1972).  The government is also in the process of finalizing transcriptions of substantial parts of the audio/video recordings and will promptly produce those transcriptions to the defense.  The government is and will remain mindful of its obligations under Rule 16, Brady and Giglio.  Accordingly, the government will divulge to the defense at or before the time of trial, and in time for effective use at trial, all information subject to disclosure under those authorities.[40]  For this reason alone, the defendants' routine discovery motions should be denied without prejudice to be re-filed in the event the defendants develop a specific, articulable discovery claim that requires Court intervention.

---

[40]  Many of the defendants' Giglio requests seeking "any and all records" are overbroad and without merit.  Nevertheless, because the defendants' motion for production of Giglio information is premature, at best, the government need not address, at this time, the merits of each of the defendants' requests.  However, the government would point out that the defendants have requested "any and all personnel files concerning [government] witnesses."  (See R. 36, PageID 306.)  The defendants are not entitled to the personnel files of government witnesses because they have not and cannot demonstrate a sufficient reason to believe such files contain material information.  See United States v. Driscoll, 970 F.2d 1472, 1482 (6th Cir. 1992) (rejecting defendant's argument that he was entitled to arresting officers' personnel files because he failed to offer any support for his contention that personnel files might contain information important to his case), abrogated on other grounds by Hampton v. United States, 191 F.3d 695 (6th Cir. 1999)).

To the extent the defendants' motion for <u>Giglio</u> information (R. 36) seeks immediate or early disclosure of <u>Giglio</u> information, that request should be denied as well.  The defendants cite no legal or factual basis for immediate disclosure of <u>Giglio</u> information.  Indeed, contrary to any suggestion by the defendants that they are entitled to such information immediately, the Sixth Circuit has held "that due process requires only that disclosure of exculpatory material be made *in sufficient time to permit the defendant to make effective use of that material at trial*."  <u>See</u> <u>United States v. Farley</u>, 2 F.3d 645, 654 (6th Cir. 1993) (citing <u>United States v. Presser</u>, 844 F.2d 1275, 1275, 1284 (6th Cir. 1988) (emphasis added).  In <u>Farley</u>, the Sixth Circuit rejected a claim that the defendant was denied a fair trial by the government's disclosure of <u>Brady</u> information mid-trial—after the government had concluded its case-in-chief.  <u>Farley</u>, 2 F.3d at 654.

More significantly, on the other hand, the government has compelling reasons in this case to delay the disclosure of <u>Giglio</u> information, if any, until trial or shortly before trial.  The Court is familiar with some of these reasons as set forth in the government's motion for a protective order in this case.  (<u>See, e.g.</u>, Gov.'s Mot. Protective Order, R. 24.)  This case was one of many cases involving a broad ATF-lead investigation targeting gun and other violent offenders in the Cleveland area.  Throughout the investigation, agents utilized several of the same confidential informants to conduct transactions with numerous defendants.  Many of the defendants charged as a result of the ATF investigation, including the defendants in this case, have criminal histories involving convictions or at least charges for violent conduct.  To the extent the government decides to call either or both of the confidential informants involved in this case as a witness at trial, disclosure of <u>Giglio</u> information relating to the confidential informants would identify the confidential informants and pose an immediate and substantial risk that the informants could be subjected to physical harm or other reprisal.  Further information regarding the government's

69

good-faith concerns for witness safety, is set forth in the sealed, <u>ex-parte</u> filing in support of this Response.

Accordingly, the defendants' motions for production of Brady information and Giglio information should be denied without prejudice to re-file in the event a legitimate discovery dispute develops and Court intervention is necessary.  The government has satisfied its obligations under Rule 16(a)(1) and <u>Brady</u>, and understands its continuing <u>Brady</u>/<u>Giglio</u> obligations, and will comply with the requirements of, and its obligations under, these authorities when it is required by law to do so.

### 2.  <u>Motion for Early Production of Jencks Material</u>

The defendants request that the Court order the government to produce material discoverable under the Jencks Act, Title 18 U.S.C. § 3500, and Fed. R. Crim. P. 26.2, three weeks before trial.  (<u>See</u> Defs. Mot. for Early Disclosure of Jencks Material, R. 43.)  This motion should be denied because the defendants' request is without legal basis, and furthermore, is unnecessary under the facts and circumstances of this case.

First, the defendants' request is contrary to the law in the Sixth Circuit.  "The clear and consistent rule of this circuit is that the intent of Congress expressed in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial." <u>Presser</u>, 844 F.2d at 1283.  For this reason alone, the defendants' motion should be denied.

The defendants also have not articulated any need for early disclosure of any additional Jencks material.  As noted <u>supra</u>, defense counsel have had in their possession for months nearly all of the Jencks material in this case, specifically, the 28 investigative reports the government has previously disclosed. The only potential undisclosed Jencks material is the grand jury testimony of case agent Russell Johnson, and the defendants have not and cannot establish any

need for disclosure of this material three weeks before trial.[41]  Agent Johnson's grand jury

testimony is a summary of the investigation, and as such, the substance of his testimony is

contained in the previously disclosed investigative reports and other discovery.  The defendants

do not need anywhere near three weeks of time to review this grand jury testimony in order to be

able to make effective use of it at trial.  For all of these reasons, the defendants' motion for early

release of Jenks Act material should be denied.

<div style="margin-left:40%">

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney


By:     /s/ Kelly L. Galvin
        Kelly L. Galvin (OH: 0062585)
        Paul M. Flannery (OH: 0091480)
        Assistant United States Attorneys
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, OH 44113
        (216) 622-3731 (Galvin)
        (216) 622-3958 (Flannery)
        (216) 522-8355 (facsimile)
        k.galvin@usdoj.gov
        paul.flannery@usdoj.gov

</div>

---

[41] In order to avoid interruptions or delays in the trial, the government will provide additional
Jencks material, if any, shortly before trial.

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March 2015 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Kelly L. Galvin
Kelly L. Galvin
Assistant U.S. Attorney